JOSEPH IASIGI AND THOMAS A. GODDARD, PLAINTIFFS IN ERROR, *v.* JAMES BROWN, AND THOMAS B. CURTIS, TRUSTEE OF SAID BROWN.[*]

Where an action was brought against a person for making false representations of the pecuniary condition of a certain party, whereby the plaintiff had been induced to sell goods upon credit, and had incurred loss, evidence conducing to show that the statements of the defendant were false, ought to have been allowed to go to the jury.

The defendant having written to his own agent, and headed the letter confidential, it was for the jury to say whether or not it was intended for the exclusive perusal of the agent.

It was also for the jury to say, on a thorough examination of the letters and the facts and circumstances connected with them, whether they were calculated to inspire, and did inspire, a false confidence in the pecuniary responsibility of the party, to which the writer knew he was not entitled.

THIS case was brought up by writ of error from the circuit court of the United States for the district of Massachusetts.

The entire history of the case is given in the opinion of the court.

It was argued by *Mr. Bartlett,* and there was also a printed brief by *Mr. Lawrence,* for the plaintiffs in error, and by *Mr. Lord* and *Mr. Merwin,* for the defendants in error.

The counsel for the plaintiffs in error, made the three following points, of which the reporter has only room to give the argument upon the first.

I. That the rejection of the proffered testimony by the district judge, " as immaterial, and as insufficient, when taken in connection with the other evidence, to authorize the jury to find a

------

[*] Mr. JUSTICE CATRON did not sit in this cause.

verdict for the plaintiffs," and his further peremptory directions to the jury, without the consent of plaintiffs, to return their verdict for defendant, was unwarranted by law, and a departure from the practice and principles established by this court, and by the highest local tribunal, for the conducting of trials at Nisi Prius.

II. That if it could be deemed competent and lawful, in any case, to withdraw from the jury the determination of facts, where proofs legally admissible, and having a possible tendency to support the issue, have been introduced or offered, yet having regard to the character of the facts proved and offered for proof in this case, and the nature of the issue, the questions were purely questions for a jury.

III. That if in this case, resting, as it does, on charges of actual and not constructive fraud, involving, as it must, a question of intention, it be in the power of the judge, against the consent of plaintiffs, to determine the value of the testimony, and direct a verdict, (upon the ground that such course is equivalent to a demurrer to evidence,) even then the plaintiffs submit that, tried by the rules pertaining to a demurrer to evidence, the judge erred in directing a verdict for defendant.

1. The first proposition asks the judgment of this court upon a proceeding, not a mere indifferent matter of practice, but one that involves the substantial rights of parties ; and that question is, whether in any case, after the introduction or offer of evidence legally competent, and having a bearing on the issue, it is the right of a judge at Nisi Prius, upon his view of the value of the proofs, peremptorily to direct, against plaintiff's consent, a verdict for defendant.

It assumes, what is apparent throughout the opinion of the district judge, that there was evidence to be weighed.

This question is to be determined, as well by the principles heretofore settled by this court, as by the " modes of proceeding" of the State of Massachusetts, which by the acts of congress of 1789 and 1792 have been adopted into the courts of the United States.

A peremptory direction to a jury to return a verdict for a defendant, after the introduction of evidence competent to sustain the issue, cannot be distinguished in principle, though it differs in form, from an order of nonsuit, and so it has been held. Morgan *v.* Ide, 8 Cush. 420.

It has been repeatedly settled by this court that it is not in the power of the judge, without the plaintiff's consent, to order a nonsuit. Elmore *v.* Grymes, 1 Pet. 469 ; De Wolf *v.* Rabaud, Ib. 476 ; Crane *v.* Morris, 6 Ib. 598 ; Silsby *v.* Foote, 14 How. **218.**

It has been settled in the same manner in Massachusetts by the latest case directly on the point, and so treated in the local books of practice. Mitchell *v.* New England Insurance Co. 6 Pick. 117; Colby's Practice, 225.

The ground assigned by this court is as follows: " The circuit court had no authority to order a peremptory nonsuit, against the will of the plaintiff; he had a right, by law, to a trial by jury, and to have had the case submitted to them."

The same principle prevails in England. " It also appears that the plaintiff is in nowise compellable to be nonsuited after he has appeared, and therefore if he insist upon the matter being left to the jury, they must give in their verdict, &c." 2 Lee's Dict. of Practice in B. R. and C. B., 958.

Such being the principles settled by this court and the state court, as to nonsuits, it remains to inquire what is the doctrine of both as to peremptory instructions to juries to return verdicts as directed, and it is submitted that there are numerous decisions in this court, by which it is settled that where there is any legally competent evidence offered, the case must be submitted to the jury with appropriate instructions. Thus in Greenleaf *v.* Birth, 9 Pet. 292, the court say, on p. 299: " Where there is no evidence tending to prove a particular fact, the court are bound so to instruct the jury, when requested : but they cannot legally give any instruction which shall take from the jury the right of weighing the evidence, and determining what effect it shall have." So in United States *v.* Laub, 12 Pet. 1, the court say : " If the court erred in not giving the instructions asked on the part of the plaintiff, it must have been on the ground that no evidence, tending to prove the matter in dispute, had been given to the jury. For it is a point too well settled to be now drawn in question, that the effect and sufficiency of the evidence are for the consideration and determination of the jury ; and the error is to be redressed, if at all, by application to the court below for a new trial." United States *v.* Laub, 12 Pet. 1, 5.

Again : " The first prayer of defendants to instruct the jury that upon the whole evidence the plaintiffs ought not to recover, if it might properly have been granted in any case in which any testimony was offered, certainly ought not to have been granted if any possible construction of that testimony would support the action." Bank of Washington *v.* Triplett et al. 1 Pet. 25, 31. See also Chesapeake Ohio Can. Co. *v.* Knapp et al. 9 Ib. 541, 568 ; Scott *v.* Lloyd, 9 Pet. 418, 445 ; Roach *v.* Hullings, 16 Ib. 319, 323.

The doctrine of the supreme court of Massachusetts is well established, namely, that the court have merely the power to advise

16 *

a verdict, even where a verdict, inconsistent with that advice, ought to be set aside. Davis *v.* Maxwell, 12 Met. 286; Morgan *v.* Ide, 8 Cush. 420.

If the rule of this court and of the state court be as is contended, it would be decisive of the case, but it is submitted that it is founded on principles essential to the safety of suitors.

It does not exclude the power of the judge to determine the legal competency or admissibility of evidence; but merely of peremptorily deciding as to its weight.

If the verdict be against his advice to the jury, a motion for new trial, see 12 Pet. 1, brings with it an opportunity of careful review — it may be with the aid of his associate — which the rapidity of a trial has not offered.

At all events, peremptory directions to return verdicts, upon the ground that they are analogous to a demurrer to evidence, are fatal to the losing party in a court of error, to which court the appearance, demeanor, and credibility of witnesses can never be transferred, and demurrers to evidence are not encouraged in this court. United States Bank *v.* Smith, 11 Wheat. 171.

The first two points of the counsel for the defendant in error related to the statute of Massachusetts, which, they contended, was similar to 9 George IV. ch. 14, § 6, called Lord Tenterden's act, the English cases under which were Lyde *v.* Barnard, 1 Mees. and W. 101; Haslop *v.* Fergusson, 7 Ad. and Ellis, 86; Swann *v.* Phillips, 8 Ad. and Ellis, 457; Devaux *v.* Steinkeller, 6 Bing. N. C. 84.

III. The representation, being now, of necessity, a statutory document, the construction of it belongs to the court.

And this, whether the interpretation is to be made on the paper singly, or on previously existing facts, sometimes to be taken into view, to put the court in the place of the writer in understanding his language.

The question does not become a mixed question of fact and law, unless there be evidence that the language was used in a special or technical sense, or the auxiliary facts be proved by uncertain or conflicting evidence. In the present case there was no evidence of the use of words in any special or technical sense; nor was there any conflict of evidence as to any fact needed in the understanding of the letters. Bell *v.* Bruen, 1 How. 183; Turner *v.* Yates, 16 Ib. 23.

IV. The plaintiffs are not entitled to recover, because of the terms of the letter of Mr. Curtis, to which it was a reply.

The letter of Curtis, of April 5, invites a reply, "to be discreetly used by myself."

1. It is widely without the statute, to allow the information to be used by another.

If, in Mr. Brown's letter, he had incorporated this phrase, " my opinion is to be used by yourself only," it would be no stronger in effect; and to allow a construction of such a letter to embrace all persons to whom it should be shown, could not be done without disregard to the statute, and to common fairness. This would not be to substitute a principal, but would introduce a multitude of strangers.

2. The letter of Mr. Curtis invites information to be " discreetly used by myself."

It cannot be that this commits the document to be used at the discretion of all to whom it shall be shown. Written to a discreet man, the reply, true or false, might be very harmless; to an indiscreet man, it might be the reverse. Written to one man, the utmost conceivable credit given on it might not exceed hundreds; to another, it might amount up to hundreds of thousands.

3. Written to Mr. Curtis, it would be limited, in Mr. Brown's understanding, to the use of it only in the business of his agency; operating only on the standing of the parties receiving credits from him, who might deal with the debtors inquired of, and thus be incapable of serious injury; but read by another, acting on his own eagerness or necessities to sell, it might prove ruinous.

4. Founding the action for false representation on the principle of holding a man to the consequences of his statements of credit, fairness requires that such facts should be made known to him as would enable him to see the consequences; and that he should not be held to unknown results which could not have been foreseen without a knowledge which might and ought to have been imparted.

5. The plaintiffs cannot set up that they were unaware of this limitation in the communication to Mr. Brown; the two letters are but one communication, and if they claim it at all, it must be with the limit under which it was obtained.

V. The letter of April 7 was, by its terms, exclusively limited to Mr. Curtis alone, by its being inscribed " Confidential."

1. The plain meaning of this word, as applied to a letter, is, that the communication is confided to him to whom it is addressed, and to no other person: " to be kept in confidence, private; as, a confidential matter." Webster's Dic.

2. This signification is confirmed, by its being superadded to the words of Mr. Curtis's letter; notwithstanding the promise, that the desired opinion would be discreetly used, and by himself, (which warranted any action in his own dealings,) the additional caution was, that the communication itself should be kept wholly personal between the writer and the addressed party.

The word " confidential " is not capable of a sense, that per-

mits it not only to be shown to a stranger, or any number of strangers, but to be used by him or them, and in his or their discretion, and acted on by him and them, at any future time, and to an unlimited amount. Such a sense of the word is not shown by any evidence, nor called for by any individual justice in this case, nor by any general principle of policy or justice.

3. The letter of 7th April was also " confidential," in consequence of its communications concerning the defendant's own involvements and connection with the parties inquired of.

4. The conduct of Mr. Curtis in submitting the letter to the plaintiff's inspection, on his urgent entreaties, has no bearing on the question. He, in strictness, violated the confidence placed in him; doubtless under the tacit obligation on the part of the plaintiffs to receive it, as he, Curtis, did, only in reference to the existing claims of Iasigi, and to quiet him.

VI. The subsequent letter of Brown, Brothers, and Co., of June 27 has no bearing on the construction of the letter of April 7.

1. It does not in terms, or by implication, refer to it. The phrase " we continue," &c., is fully warranted, as to all reference, by a public and general knowledge of the previous friendly relations and dealings of Brown, Brothers, and Co. with the parties referred to.

To introduce a paper by relation into instruments under the statute of frauds, express reference is necessary. Per Mr. Justice Nelson, Salmon Falls Manufacturing Co. *v.* Goddard, 14 How. 456, and cases cited there.

2. The letter referred to that of Curtis of 26th June, who said: " I replied, that I believed you thought favorably of the concern," (p. 7,) showing nothing as to having exhibited the previous letter to any one.

VII. The conversations in October and January following, cannot be used in the interpretation of the letter of 7th April.

1. The conversation of January, spoken of by Mr. Grant, (p. 13,) was in relation to his own sales, which he says were made on the faith of the letters (meaning both); whereas he states: " I never saw the letter till after the failure, but got its contents from Mr. Iasigi." P. 13.

Mr. Iasigi's statement of the contents cannot be the basis of any inferences within the statute. Nor does any thing appear to have been said in this conversation as to any right in Mr. Curtis to exhibit the first letter.

2. The conversation of October 15 is wholly inadmissible, under the statute of frauds of Massachusetts. It consists of very loose oral evidence, not distinguishing what was said by the two Messrs. Brown; it was given, in order to render a letter,

which was in its terms confidential, in effect public, with the widest and most indefinite responsibility. This would defeat the statute in the most palpable manner.

3. Again: It seeks to involve the defendant in a responsibility for the first letter, because he or his partner declared that it was a "guarded" letter. This is not only giving oral evidence to vary the writing, but adds to it the remoteness of an insufficient inference from the oral evidence.

4. Again: Its being a guarded letter, had reference to its effect on Mr. Curtis himself, and by no necessity implied guarded as to others, who, by its being confidential, were not expected to see it.

5. Again: It is attempted to argue, from the silence by Messrs. Brown, in reference to the exhibition of the letter by Mr. Curtis, that he had originally intended it. But this is giving in evidence mere silence, in order to extend the effect of a statutory document.

6. But lastly: The purpose and object of this conversation was to press a supposed moral right in these gentlemen, Iasigi, Grant, and Kendall, to share in an attachment made by Messrs. Brown, and not at all to discuss their liability at law on the letters in question.

VIII. The offers of proof, tending to show the facts stated in the letter of April 7 false and suppressive, were wholly insufficient and inadmissible.

1. Supposing such evidence given, it would have been no warrant to impute an intent, that the letter should be shown, much less would it tend to enlarge or contradict its language.

2. The evidence seeks to contradict the effect of a writing by oral evidence, that it would have effected frauds if its terms were disregarded.

3. The evidence offered seeks to reverse the policy of the statute. This policy was to shield all men from charges of fraud, without a writing to be falsified. The offers attempt first to try the man for fraud, and thence to imply a sufficient representation.

Last. It was the duty of the judge to have directed the jury to bring in a verdict for the defendants. Parks *v.* Ross, 11 How. 372.

Mr. Justice McLEAN delivered the opinion of the court.

This case is brought before us by a writ of error to the circuit court of the United States for the district of Massachusetts.

The plaintiffs are merchants in Boston, and deal largely in wool, and, prior to the 4th of April, 1851, sold, occasionally, to

two corporations in the State of Connecticut, called the Thomp-sonville Company and the Tariffville Company, and received therefor their notes, indorsed by Orrin Thompson. And, with the view of making further sales to them, having become doubt-ful of their pecuniary means and ability to make payment in future, the plaintiffs applied to Thomas B. Curtis, of Boston, the agent of defendant, to ascertain his opinion as to any possi-bility of loss, by selling largely on credit to said corporations or to Thompson; the plaintiffs knowing that the defendant was friendly to the companies, and intimately acquainted with their pecuniary condition.

A letter was written to defendant, by his agent, Curtis; and an answer was received, as alleged in the declaration of the plaintiffs, which induced them to give large credits to the two companies and Orrin Thompson, when, at the time, they were insolvent, which fact was known to the defendant.

The points in the case are stated in the bill of exceptions, and arise on the construction of the above letter and one of a subsequent date, and on facts proved and offered to be proved, which conduced to show, as plaintiffs insist, the fraudulent intent with which the letters were written.

The first letter, from Curtis to Brown, bears date the 5th of April, 1851, and reads as follows: " Dear Sir — I have your note of yesterday, but have scarcely had a moment to peruse it this morning. My object, at the moment, is to ask your opinion as to any possibility of loss, by selling largely to the Thompson-ville Company or Orrin Thompson. Whatever that opinion may be, it will be discreetly used by myself."

The reply to this letter is marked " confidential," and dated " New York, 7th April, 1851. T. B. Curtis, Esquire. Dear Sir: With respect to Thompson and Co. and Orrin Thompson, I have to say, that our house done business with them for some twenty years or more; they have always met their engage-ments promptly, and we feel are men of strict integrity. They have unquestionably laid out too much money in the Tariffville Manufacturing Company and the Thompsonville Carpet Manu-facturing Company, and my house has been for years in the habit of loaning them either paper or money to a considerable extent on security. On the failure of Austen and Spicer, they were unfortunately on their paper (received for sales of car-pets) for $183,000; this threw, suddenly, so heavy a burden on Thompson and Co., that Messrs. Hicks and Co. and ourselves looked into their affairs, and feeling that they had an abundance to pay every one and have a handsome sum left, if they contin-ued their business, we jointly advanced the money to pay their indorsements as they came round. for which advances we have

security.  In order, however, to relieve them from the necessity of borrowing, and needing more cash capital to carry on the business comfortably, both the companies alluded to owing Messrs. Thompson and Co. each about $375,000, making, together, $750,000, executed a mortgage to John H. Hicks, W. S. Wetmore, and James Brown, for $750,000, to secure the payment of those bonds, which are payable in six, eight, and ten years.  A gentleman goes out to Europe this month to negotiate these bonds, which he feels confident of doing on favorable terms. The negotiation of these bonds, and the securities held, would pay off all the advances made by ourselves, Messrs. Hicks and Co., and of W. S. Wetmore, who also made them some advances.  From Thompson's statement of the business of the factory, they are doing a good, nay, a very profitable business, and I feel that in making sales to them now, no more than the ordinary business risk would be run.

" If the bonds are negotiated, which is confidently expected, they would be enabled to conduct their business with more facility and comfort than they have ever yet done, and as I will recommend brother William to take from sixty to one hundred thousand dollars for himself and for me, whatever they are negotiated at, the confidence shown will probably help the negotiation.  Messrs. Hicks will also take some of them.  Since the failure, Thompson and Co. have laid their hands on Austen and Spicer's property, to the extent of fifty thousand dollars, reducing the risk to one hundred and twenty-three thousand; and out of this they will get a dividend.  As Mr. Orrin Thompson considers 1 nself fully worth four hundred thousand dollars, any loss that can now occur by Austen and Spicer does not hurt him much.  All they want is the negotiation of the bonds, to make them move on with perfect comfort.  (Signed) JAMES BROWN."

The next letter from Curtis to Brown is dated " Boston, 26th June, 1851.  A friend of ours desires me to inform him how far it would be satisfactory to me (you) to have him sell to the Thompsonville Company.  I replied that I believed you thought favorably of the concern.  Now I wish to know what your present feelings are in respect to that concern; there being several among my friends here who have heretofore sold them wool, and wish to continue to do so."

The answer to this letter was : " Dear Sir — We are in receipt of yours 26th instant; contents noted.  We continue to have a favorable opinion of the concern you allude to.  (Signed) BROWN, BROTHERS, AND Co."

Mr. Curtis being called as a witness, said he was agent for Brown, Brothers, and Co., who carried on, in the city of New

York, an extensive banking business. He wrote his first letter at the request of Iasigi, and never showed the reply except to him and his friend, Mr. Skinner, until after the failure of the Thompsons. When he wrote to Brown, he did not let him know that the information requested was for any other person than himself. On the day his first letter was written, Iasigi said to him that he held a large amount of notes of certain factories in Connecticut, indorsed by Orrin Thompson, of New York; that by the recent failure of Austen and Spicer they had lost money, and he was solicitous about the paper he held. Witness supposed it amounted to about the sum of $40,000. He said Brown was the friend of Thompson, and witness was requested to ascertain his standing by writing to Brown.

As the answer was marked confidential, the witness, when Iasigi first read the letter, declined handing it to him to show to his partner, but on his calling, it was shown to him also. Witness expressed a favorable opinion as to Iasigi's getting his money. Mr. Brown never authorized the witness to show his letter to any one. After the failure of Thompson, Iasigi stated he had collected his debt, but that he again trusted them. The witness remarked, that on that letter you should not have trusted them. He asked to see the letter, and on reading it he said, if you had not stated this to be the same letter, I should not have believed it.

The witness stated, some of our clients prior to this had be .n in the habit of selling wool to Thompson and Co. There were five or six firms, importers of wool, who had credits with me. It was highly important to me and my principals that I should know the standing of this great concern, because large amounts of credits were being invested in wool, by houses which might or might not be jeoparded by selling to that concern; I mean invested by correspondents of Brown, Brothers, and Co., who had credits for them.

Mr. Grant, a witness, stated that he, Iasigi, and several others who had sold wool to the two companies and Thompson, had an interview with the defendant at his office in the city of New York, where a conversation respecting the letters was had, principally between Iasigi and Brown, who replied that the letter of the 7th of April was a guarded one, and as to the second letter, it was only a statement that "we continue to have a favorable opinion of the concern." He proceeded to say that the connection of Brown, Brothers, and Co. with Mr. Thompson had been of long date; that they had a great number of transactions together, and that at the time the April letter was written, they intended to carry Mr. Thompson through; but that Thompson had deceived them. He repeated several times that

this was a guarded letter, and as it was written in entire good faith, and as they had lost much more than we had subsequently to the writing of the letter, they did not see how there could be any responsibility resting on them.

As the company was about separating, Mr. Stewart Brown observed: " If you had called on us, gentlemen, and conversed with us, instead of writing, you would not have sold this wool. That the letter was a guarded one, was several times repeated. That they had great confidence in Thompson; that at the time the letter was written they had lost their confidence, but still meant to carry him through in good faith; but being unable to do so, and having lost their confidence, the letter was guarded." On being asked by witness, if, at the time the first letter was written, he had all the property of Orrin Thompson conveyed to him, he replied: " No, sir, not all his property, but his real estate." There was no objection at this time by any one, that the letter was confidential. The Browns refused to acknowledge any responsibility.

After this evidence had been given, the plaintiffs offered evidence, not objected to or excluded, except as hereinafter stated, tending to prove that certain statements in the letter of April 7, 1851, material to show the property and credit of the two companies, and of Orrin Thompson, and the safety and expediency of selling them goods on credit, and material to influence and determine the judgment of one who should read the letter, in regard to the safety and expediency of so selling goods on credit, were false at the time the letter was written, an i were then known to the defendant to be false. And that the defendant, prior to the 7th of April, alone and jointly with one Hicks, had taken conveyances, in mortgage or absolutely, of all Orrin Thompson's property, real and personal, with some small exceptions, to the amount of one hundred and eighty-eight thousand dollars, as security for the debt and liabilities of the house of Thompson and Co. to defendant's house and said Hicks, amounting to over five hundred and nine thousand dollars. And also offered evidence to prove that defendant had an interest of a pecuniary kind to sustain the credit of said Thompsonville Company, said Tariffville Manufacturing Company, and Orrin Thompson, and to induce extensive sales of goods on credit to them.

And other evidence was offered conducing to show that the letter was written with a fraudulent intent, and that it was intended for other persons than Curtis. And the plaintiffs proved that they made the sales stated in the declaration, relying on and trusting to the statements in said letter.

But the evidence, as above offered, was rejected as immaterial and as insufficient, when taken in connection with the other

evidence above set forth, to authorize the jury to find a verdict for the plaintiffs.

And the court thereupon ruled and held, that the plaintiffs had not maintained their action, and directed a verdict for the defendant. And a verdict was accordingly so rendered. To which rulings and direction the counsel for the plaintiffs excepted.

The 3d section of the act of Massachusetts, to prevent frauds and perjuries in contracts and actions founded thereon, published in the Revised Statutes of 1836, provides that " No action shall be brought to charge any person, upon or by reason of any representation or assurance, made concerning the character, conduct, credit, trade, or dealings of any other person, unless such representation or assurance be made in writing, and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized."

As the letter was written in New York, a doubt has been suggested whether this statute can apply to the case. The letter was intended to operate in Massachusetts, and consequently the law of that State applies to it. But it is not perceived that the statute can have any other effect than to require the representation, on which the defendant is charged, to be in writing.

No one controverts the power and duty of the court to construe all written agreements or papers which are given in evidence. This is not the question involved in this case. No individual can be held responsible for a statement of facts, however injurious they may be to an individual or company. But when there is a misstatement of facts in regard to the pecuniary ability of an individual or company, and, especially, if this be done through interested motives or a fraudulent intent, by reason of which a credit is given and the debt is lost, the facts which conduce to establish the liability must, as in this case, be outside of the writing. And if these facts may not be established by parol evidence, there can be no remedy in such cases, however gross the fraud or ruinous the consequences may be.

It is contended that the letter of the 7th of April, being marked confidential, could have been intended only for Curtis, the agent, and that he was not authorized to show it to the plaintiffs. In his testimony Mr. Curtis says, Brown never authorized him to show the letter. There may have been no express authority to show the letter, but the intention of the writer, in this respect, can be best ascertained by reference to the facts and circumstances under which it was written.

In his letter of April the 5th, Mr. Curtis requested to know " the opinion of the defendant as to any possibility of loss by selling largely to the Thompsonville Company or Orrin Thomp-

son; and he remarks, whatever that opinion may be, it will be discreetly used by myself."

Mr. Curtis states, when under examination as a witness, that he was then, and had been for several years, acting as the agent of the Browns, and that was his principal business. He said that he was not, at any time, a seller of wool to the factories of Orrin Thompson. This employment of the agent must have been known to his principal, and it appears in the proof that when the plaintiffs and others had an interview with the defendant, in New York, he spoke of the letter being guarded, but made no objection that it had been written to his agent in confidence, and ought not to have been shown to the plaintiffs.

In view of these and other facts, it might have been submitted to the jury whether the defendant, in marking his letter " confidential," intended it for the eye of his agent only. The terms of the letter, independently of the above facts, would scarcely authorize such an inference. The " opinion will be discreetly used by myself." This was notice to Brown that the opinion was to be used, and how could it be used by the agent, who made no sales of wool to Thompson on his own account, without imparting the opinion to others; but " the opinion will be discreetly used by myself." It shall not be made known by any other person than myself, and you may rely on my discretion. In view of the facts, the jury should consider whether the word " confidential " might be construed to mean, in confidence that you will use my opinion discreetly by yourself, as you propose, or whether it restricted the letter to the agent only.

This seems to have been the construction given to the letter by the agent. He suffered Iasigi to read it, but refused to give it into his hands to show to Skinner. Had the writer intended that n > one should read the letter but Curtis, he would probably have said so. Such a restriction was not necessarily imposed by the terms of the letter, in view of the facts proved. Its detailed statement of facts in regard to the embarrassments of the two concerns and of Orrin Thompson, and how they had been relieved by himself and others, and enabled to do a good, nay " a profitable business," &c., would be a matter, in connection with other facts, for the jury to consider, and to determine whether the letter could have been written for the eye of the agent only, who at no time sold wool to Orrin Thompson.

In another letter written to the defendant by Curtis, he says : " A friend of ours desires me to inform him how far it would be satisfactory to me, (you,) to have him sell to the Thompsonville Company. I replied that I believed you thought favorably of the concern. Now, I wish to know what your present feelings are in respect to that concern, there being several among

my friends who have heretofore sold them wool, and wish to continue to do so." To this, Brown, Brothers, and Co. reply: " We continue to have a favorable opinion of the concern you allude to."

This letter sheds some light on the first letter of Brown. It was on the same subject, and was a reiteration of what had been stated more particularly and at large in the first letter. In fact, the words " we continue to have a favorable opinion of the concern you allude to," refers to an opinion before expressed.

As the court instructed the jury to find for the defendant, on the ground that the plaintiffs had not sustained their action, if the plaintiffs gave, or offered to give, any evidence which was fit to be considered by the jury, the judgment must be reversed. Any evidence conducing to prove that the statements of the defendant, in the letter of the 7th April, in regard to the condition of the Thompsonville Company and Orrin Thompson, and their ability to meet their engagements, and in regard to the value of Thompson's property, were false, was competent evidence as tending to prove the facts. And especially was the testimony of Grant admissible, who heard the defendant say, if the plaintiffs had called on them personally, they would not have sold their wool to the company; also the statement that before the letter was written, Brown admitted that he had lost confidence in Thompson, and therefore the letter of the 7th of April was guarded. These, and all other facts which conduce to show that the defendant acted in bad faith in writing that letter, are proper to be considered by the jury.

By whatever motives the defendant may have been actuated, he is not to be held responsible, unless his letters did mislead, and were intended to mislead the plaintiffs. And it will be for the jury to say, on a thorough examination of the letters, and the facts and circumstances connected with them, whether they were calculated to inspire, and did inspire, a false confidence in the pecuniary responsibility of the Thompsonville Company and Orrin Thompson. If an impression, not only of their solvency but of their success in business, so that by selling largely to them no more than the ordinary risks of business were incurred, was made and authorized, by the letters, while, at the same time, their true condition was known to the defendant, which did not authorize such a representation, and which was intended to deceive and mislead the plaintiffs, the defendant may be justly held responsible. But of this the jury are to judge, they being the triers of the facts outside of the letters, and which should be submitted to them for their consideration and decision.

We have necessarily referred to the leading facts stated in the bill of exceptions, in order to show that the circuit court erred in

withdrawing them from the jury; but we express no opinion on the merits of the case.

The judgment of the circuit court is reversed, and the cause is remanded for a *venire de novo.*

Mr. Justice NELSON, Mr. Justice CURTIS, and Mr. Justice CAMPBELL dissented.

Mr. Justice CURTIS.

I do not agree with the majority of my brethren in this case. But, as I may be required to preside at the trial which has now been ordered, I am not willing to enter into a discussion of the evidence heretofore given, and which will doubtless be repeated on another trial. Without doing so, it is not practicable to exhibit the legal principles which, in my opinion, should govern this case. I, therefore, merely say I do not concur in the judgment.

Mr. Justice CAMPBELL, dissenting.

The importance of this cause renders it proper that the reasons for a dissent from the judgment should be placed on the record. The charge of the plaintiffs is, that in anticipation of large sales of merchandise to two manufacturing corporations of Connecticut, on a credit, and distrustful of their condition to govern and direct their conduct, they sought of the defendant, through his agent, an opinion and information of them and their indorser, Orrin Thompson, as to the risk they would encounter. That the defendant was intimate with their affairs, and knew they were untrustworthy; but well knowing the motives of the plaintiffs inquiry, they wrote to their agent a letter, for exhibition, containing false and fraudulent statements and representations, calculated and designed to increase the credit of the corporations and Thompson, and to induce the plaintiffs and others, who, like them, should see the letter, to sell their property to them. These averments, describing the circumstances under which the information was obtained, and the knowledge of the defendant of the aims of the plaintiffs, are, in my opinion, material, and should be substantially proved.

In Pasley v. Freeman, 3 T. R. 51, Justice Ashurst, replying to the argument that, should the principle of that suit be supported, actions might be brought against any one for telling a lie by the crediting of which another sustains damage, said "No; for, in order to make it actionable, it must be accompanied with the circumstances averred in the count, namely, that the defendant, intending to deceive and defraud

the plaintiff, did deceitfully encourage and persuade them to do the act and for the purpose made the false affirmation, in consequence of which they did the act." And Lord Kenyon said two grounds of the action concur: " The plaintiffs applied to the defendant, telling him that they were going to deal with Falch, and desiring to be informed of his credit, when the defendant fraudulently, and knowing it to be otherwise, and with a design to deceive the plaintiffs, made the false affirmation which is stated on the record, by which they sustained a considerable damage."

The case of Pilmore v. Hood, 5 Bing. N. C. 97, was that of a defendant about to sell a public house to one who had agreed to purchase.    He fraudulently misrepresented to him its receipts. The bargain having failed, the sale was made to another, who had heard these representations and acted upon them with the knowledge of the defendant.    Lord Chief Justice Tyndal said that notice to the defendant was " an important ingredient in the case," and adapting the terms of Langridge v. Levy, 2 M. and W. 532, he says: " We do not decide whether the action would have been maintainable if the plaintiff had not known of and acted upon the false representation.    Nor whether the defendant would have been responsible to a person not within the defendants' contemplation at the time of the sale, to whom the gun might have been sold or handed over.    We decide that he is responsible in this case for the consequences of his fraud, whilst the instrument was in the possession of a person to whom his representation was either directly or indirectly communicated, and for whose use he knew it was purchased."

In Gerhard v. Bates, 2 Ell. and Black. 476, the misrepresentation was contained in the prospectus of a bubble company, of which the defendant was a director.    Lord Campbell said, " that had the plaintiff only averred that afterwards, having seen the prospectus, the plaintiff was induced to purchase the shares, objection might have been made that a connection did not sufficiently appear between the act of the defendant, and the act of the plaintiff, from which the loss arose; but the second count goes on expressly to charge the defendant, that by means of the said false, fraudulent, and deceitful pretences and representations, he wrongfully and fraudulently induced the plaintiff to become the purchaser and bearer, and plaintiff did then and by reason thereof actually become the purchaser and holder of the shares, and alleges the loss sustained to have been the direct consequence of the defendant's act.    Thus the wrong and the loss are clearly concatenated as cause and effect."

The allegations, therefore, being essential to the action, the

question is, was there any evidence to go to the jury for their support?

I leave out of consideration, for the present, the statute law of Massachusetts. The charge of the declaration is that the letter was written for exhibition to the plaintiffs and among dealers like the plaintiffs, and to deceive those who should see it. The proof of the plaintiffs is that until after the failure of the corporations, only two persons were permitted to see it, or heard of its contents from Mr. Curtis. One of these was Skinner. The proof in regard to the exhibition to him is: " Iasigi asked me (Curtis) to let him take the letter to his friend Skinner, with whom he always advised. I (Curtis) again said the letter was confidential, and that I could not suffer it to go from my office. He then said, will you let Skinner see it here, repeating that he always advised with Skinner on matters of importance, and that he wanted him to see it. Upon this solicitation I consented, and Skinner came with Iasigi, and read the letter."

There is no evidence that Skinner ever had a transaction with the corporations of Connecticut, or conducted a business which could bring them into any contact or connection. And surely. this evidence can afford no support to the averment of a purpose to defraud or injure him or others through him.

The charge in the declaration, by this evidence, loses its generality, and is reduced to the imputation of a mischievous and fraudulent design upon the plaintiffs alone. The only use, " the discreet use," of the opinion contained in the defendant's letter, consisted in communicating its contents to Iasigi himself, and to his confidential friend, at his solicitation, and that he might advise intelligently with him. It then becomes necessary to inquire of the circumstances under which that communication was made to him. It was not told to the defendant that the plaintiffs had asked for information of Mr. Curtis, nor that his letter was written at his request, nor was he advised until several months afterwards that any use had been made of the letter. I do not think it necessary to consider how much the power of the agent was limited by the mark " confidential," on the face of the letter, but I will suppose that it was nothing more than a repetition of the caution that it should be " discreetly used " by Mr. Curtis, and that the defendant is liable for the use he made.

The evidence on the record comes from the plaintiffs; and in reference to the circumstances of the exhibition, from a single witness. The agent of the defendant was the near neighbor and friend of the plaintiffs, but had never had any intercourse of business with them, either for himself or for his principal.

Such being their relations, Iasigi, on the 5th April, came to

him as a friend and neighbor, and stated, that " he had a large amount of notes of certain factories in Connecticut, indorsed by Orrin Thompson; that there had been a failure recently, in New York, (Austen and Spicer,) by which he thought the factories, or Orrin Thompson, or all of them, would lose money ; and that he felt anxious as to the fate of the paper he held.. He did not state the amount he held exactly, but Curtis was led to believe it was about $40,000. He proceeded to say that Mr. James Brown was a friend of Orrin Thompson, and that he, Iasigi, had himself heavy dealings with him, and that he wished him (Curtis) to write to Mr. James Brown, and ask him about the standing of Thompson and his property. Curtis accordingly wrote, but did not state that he wrote at Iasigi's request." Upon this statement the particular form of the inquiry is open to, and will be the subject of remark hereafter. The question to Mr. Brown is : " What is your opinion as to any possibility of loss to the Thompsonville Company or Orrin Thompson ? The witness proceeds : " I was led to ask the information and to communicate the result to him in consequence of the friendly relations that had long existed between us, and further, because I thought it would tend to relieve Mr. Iasigi's mind, and not with a view to future sales." He says further : " at these interviews about my letter, and Brown's reply, there was nothing said about any anticipated or prospective operations by Iasigi. Mr. Iasigi said the credits were due to him." The witness " never knew that he had sold his notes," but was asked if he would guarantee them.

This statement of the circumstances of the exhibition of the letter to Iasigi contains the whole case. No other letter of the defendant was seen by him, no other communication was made to him, nor was this letter after this produced to any other person before the failure of the corporations. Now the proof of the plaintiffs is, that they held but a single note, of less than $800, running on time, at this date; the others had been sold in the winter previously, in the New York market, without indorsement or guarantee. They had a book debt then due, upon which a large payment was made within ten days after, all of which has been collected, and about which no solicitude was expressed. It likewise appears that Iasigi did contemplate further operations, for in January Thompson had taken samples of wool to arrive, and which did arrive, and was sold about six weeks from this interview.

Before closing this statement of the evidence, it is proper to note the impression that the defendant's letter made upon those who read it, as an accrediting document.

Curtis reading it with the object of deciding whether the

corporations and Thompson would meet their negotiable notes for two or three months, was willing to guarantee the debt for the usual commission; but when told that credits on sales were given afterwards, he "expressed his surprise that Iasigi should have sold after reading that letter." Skinner, who probably knew the secret purpose of Iasigi, and interpreted the letter accordingly, was not "favorably impressed." Iasigi, in reply to the expression of surprise by Curtis, quoted above, asked to see the letter again, and after reading it said: "If you did not say that this was the same letter I read in your office, I should say that I had never seen this letter before;" and the Browns, when interrogated upon it after the failure of these parties, said, that the letter was a guarded one and did not warrant credits on sales to them. Having collected the facts important to the issue, the question arises, do they constitute a case to go to the jury upon this declaration? The evidence is that the plaintiffs anticipating consignments of wool, and sales to these Connecticut corporations, and desiring the defendant's information and opinion of them, through Iasigi, approached his neighbor and friend, Mr. Curtis, the confidential agent of the defendant, to engage him to procure this opinion and information from his principal in New York. He approaches Curtis with a statement of anxieties for debts, existing in the form of negotiable notes running on time.

These statements were certainly not accurate, and are, apparently, insincere; and it will be noticed that the motive alleged in the declaration, as prompting the plaintiffs, was not revealed, and if it existed, was disguised under the apprehensions that were then expressed. The evidence shows the plaintiffs did not have notes of the amount spoken of, and that the book debt was then due. There is a discordance between this evidence and the inquiry proposed in the letter of Curtis. That inquiry discloses no apprehensions of loss upon existing debts, but refers to perils to arise on future transactions. If Iasigi suggested the form of the inquiry with a view to obtain information to guide his conduct, as the declaration avers, and concealed his aim, and by affecting an alarm he did not feel, covered that aim from Curtis, it has the appearance of circumvention. Curtis says he wrote his letter in consequence of his friendship for the plaintiffs, to calm their fears, and without an intimation of prospective operations. Curtis gave a pledge that he would use the letter of the defendant discreetly. Before the letter was placed in the hands of the plaintiffs, they were informed it was "confidential," and Iasigi read that upon the letter itself. Iasigi again confirms the impression of Curtis, that apprehensions of loss upon his notes were still moving him, by addressing queries as to the

probabilities of his getting his money, and importunes Curtis to exhibit the letter to his friend, that he might profit from his counsel. The declaration avers that this letter, exhibited under such circumstances, was written for exhibition to inquiring dealers, to encourage and persuade them to give credit to these corporations, and was shown to the plaintiffs with that design. That when it was written and exhibited, the anticipated transactions from which loss has followed, were known to the defendant, and the object of the exhibition was to induce the plaintiffs to make them.

I find no support for these averments, but a direct and palpable contradiction of them. This conclusion upon the evidence renders a discussion of the statute of Massachusetts, (Rev. Stat. ch. 74, § 3,) requiring that representations of the character, ability, and conduct of another person should be in writing to support an action, unnecessary. But the discussions upon a similar statute fortify the conclusions contained in this opinion. "The true construction of the statute," says Lord Abinger, "is, that the representation or assurance should concern or relate to the ability of the other person effectually to perform and satisfy the engagement, of a pecuniary nature, into which he has proposed to enter, and upon the faith of which he is to obtain money, credit, or goods." 1 M. and W. 101, 123. "He who has money to lend or goods to sell on credit, and doubts the ability of the borrower, or buyer," says Baron Gurney, "may exact his own terms; he may insist on having a representation or assurance in writing, of the ability, from a third person; and if that be refused, he may keep his money and goods. If he thinks fit to trust without that, he has no right to resort to the responsibility of the person of whom he inquires." S. C. 107. Baron Alderson says: "If we refer to the cases which had occurred before the legislative provision, I think it will be found that the decision in the class of cases commencing with Pasley v. Freeman, had raised a well-founded complaint in the profession of having virtually repealed the statute of frauds, by which a guarantee was required to be in writing, and that the object Lord Tenterden had in view, was to place both on the same footing, and to provide that a written document should be equally required in both. The two cases are, I think, identical in principle. He adds, "that fraud, in substance, amounts to an implied guarantee of the plaintiff's solvency."

Had Curtis given a guarantee to the plaintiffs of their debt, either for or without a commission, and accompanied the act with statements of the pecuniary condition of the debtors, and expressions of confidence in his solvency wholly unwarranted, it is clear that it would have imposed no responsibility for sales

Iasigi et al. v. Brown.

not then spoken of or alluded to, which were not made for several weeks afterwards, which were not contemplated by one of the parties, and if by the other, were concealed in all the intercourse that then took place. The statute was designed to reduce the liabilities, for the representations it describes, to some definite and appreciable limit; that the representations should be evinced in a written document, and that those who were to derive a benefit from it, as a security, should be ascertained from its contents; and that the liability on the document should not be extended beyond the engagements to which it had reference.

The questions embraced in this case, are exhibited in a short conversation detailed in the evidence of the plaintiffs. Curtis says: "After the failure of the corporations, in September, I had an interview with Mr. Iasigi. I met him in the street; he accosted me in a state of excitement; he said: 'Mr. Curtis, Thompson has failed, and the Thompsonville Company has failed.' I said: 'I am sorry, but you have got your money.' He said: 'Yes, I have got the money that was owing to me, but I have trusted them again.' I expressed surprise that he should have trusted them again."

It was not with a declared purpose of trusting them again that Iasigi sought information of Curtis; nor was the confidential letter of Mr. Brown to his agent read, with the avowal that future operations were to be affected by the impression it made; nor was the questionable act of its exhibition superinduced by any suggestions of the existence of pending negotiations.

The objects disclosed by Iasigi were wholly incompatible with, and exclusive of, the notion of any legal responsibility for the accuracy or sufficiency of the letter, or even for a wilful misrepresentation.

He did not ask for information, proposing action, even in regard to the notes of which he spoke, nor did any alteration of his debt take place in consequence. He simply inquired of Curtis, that anxieties might be relieved and his apprehensions quieted.

The liabilities incurred in cases like that described in the declaration, are for a fraud productive of damage; of damage directly consequential and in the contemplation of the parties, as a result of the act done, and not for consequences remote, contingent, and arising from acts unconnected with the objects disclosed or comprehended by them.

### Order.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district o

Massachusetts, and was argued by counsel. On consideration whereof it is now here ordered and adjudged by this court, that the judgment of the said circuit court in this cause be and the same is hereby reversed with costs, and that this cause be and the same is hereby remanded to the said circuit court, with directions to award a *venire facias de novo.*

Mr. Justice CAMPBELL, Mr. Justice NELSON, and Mr. Justice CURTIS dissented.