Euneau v. Rieger.

EUNEAU v. RIEGER *et al.*, *Appellants.*

DIVISION TWO.

105  659
146  326
79a 301

105  659
88a 142

1. **Principal and Agent**: UNDUE ADVANTAGE. An agent will not be allowed to retain an advantage over his principal derived from his confidential relation, and this is true, regardless of the fairness or unfairness of the transaction.

2. ——— : ——— : ESTOPPEL. The law, in such case, will deprive him of the fruits of his double dealing, unless the principal, with knowledge of all the facts, has permitted the agent to so change his condition that he cannot be placed *in statu quo*, and it would be inequitable for equity to interfere.

3. ——— : ———. The finding of the trial court in this case, that an agent to sell real estate had violated his duty, and, through a straw purchaser, obtained title to his principal's land, approved, and the decree divesting the title out of him and vesting it in plaintiff affirmed.

4.  **Contract:** CHAMPERTY.  A party will not be deprived of relief because the contract on which he is prosecuting his suit is infected with champerty, where he is not seeking to enforce such champertous agreement.

*Appeal from Jackson Circuit Court.*—HON. R. H. FIELD, Judge.

AFFIRMED.

C. O. *Tichenor* for appellants.

(1)  Plaintiff can only recover upon the allegations in his petition.  It is said in *N. B. & C. R. & L. Co. v. Conybeare,* 9 H. L. C. 724:  "But it is most essential, in the administration of justice in a court of equity, that the nature of the case, when it is constituted of fraud, should be most accurately and fully stated in the bill of plaintiff.  It is impossible to give relief merely upon a general charge that something has been done by a party, or has been obtained from a party, under the influence of fraud.  It must be shown in what the fraud consists, and how it has been effected.  And, if the fraud is alleged to consist in certain representations which were untrue, and other facts are relied upon for the purpose of showing that they were untrue, those facts must undoubtedly constitute a part of the case made by the plaintiff."
(2)  This case stands solitary and alone in this, that the plaintiff had to be bought to bring it.  As a rule, men are very willing to take the chances of litigation if they are furnished lawyers and are protected against costs.  A person engaged in fomenting suits at common law was a criminal (*Duke v. Harper,* 66 Mo. 60), and, under our statutes, to be thus employed is a crime. 1 R. S., sec. 3713, p. 892.  (3)  In *Dobson v. Racy,* 8 N. Y. 216, it was held that one to whom a power of attorney to sell was given could buy with the assent of the owner; to do so, he can convey, under the power of attorney, to a third party, who conveys to the agent.

(4)   A mere 'suspicion of fraud is not sufficient to set aside a deed. *United States v. Hancock*, 133 U. S. 197. The burden was on plaintiff to show fraud, "and, to justify a cancellation of the deed, the evidence adduced to establish the fraud must be clear and convincing." *Evans v. David*, 98 Mo. 411.   As to the weight to be given to the evidence of values, see *Boyd v. Wyly*, 124 U. S. 98.

*T. B. Buckner* also for appellants.

(1)  Sales of property made with full knowledge of all the facts by the vendor cannot be recovered back in equity.  (2)  A principal can sell his property to his agent, and such sale cannot be avoided in equity when the agent has been guilty of no fraud inducing the sale.  (3)  If a principal with full knowledge of all the facts acts on his own judgment and against the advice of his agent and effects a sale, even to his agent, then he cannot avoid the sale in equity, when the agent has been guilty of no fraud, simply because he afterwards finds it to his advantage to do so.  (4)  When a principal has a full knowledge of all the facts and makes a sale to his agent, or, after having received full knowledge of all the facts, receives purchase money, he thereby ratifies and confirms his previous acts.  (5)  Equity will not grant relief unless the plaintiff comes into court with clean hands.  (6)  The suit must be prosecuted in the name of the real party in interest.   In this case McElroy was, and is, the real party in interest.  (7) The agreement between McElroy and Euneau was a champertous contract.   "A bargain with the plaintiff *compum partire* to divide the land sued for between them if they prevail at law ; whereupon the champerter is to carry on the suit at his own expense." 4 Bl. Com. 135.   The complainant in this case is not only to suffer no loss in case of failure, but is to come out of the conflict with $1,000 ahead !  (8)  When a champertous agreement exists, and it is brought to the attention of the

chancellor trying the case, the complainant's bill should be dismissed. *Barker v. Barker*, 14 Wis. 142; *Allord v. Launrande*, 29 Wis. 502; *Andmos v. Thayer*, 30 Wis. 228; *Weedon v. Wallace*, 19 Tenn. 286; *Webb v. Armstrong*, 24 Tenn. 378; *Hunt v. Lyle*, 16 Tenn. 142; *Greenman v. Cohee*, 61 Ind. 201.

*Peak, Yeager & Ball* for respondent.

(1) The contract between McElroy and the plaintiff, although it may have been champertous in its nature, should have been excluded by the court. It does not excuse, palliate nor explain the conduct of defendant, and cannot impair the rights of the plaintiff. The plaintiff's right, which he is attempting to enforce, is not infected by the champertous contract, and, therefore, the contract should not be considered by this court in determining the questions involved here. *Pike v. Martindale*, 91 Mo. 268; *Bent v. Priest*, 86 Mo. 475–490. (2) There can be no doubt, from all the evidence in this case, that the defendant, L. F. Rieger, was the real purchaser of the property under the contract of sale between the plaintiff and Mills of date March 14, 1887. An agent or trustee cannot avail himself of any advantage of a contract made with his principal or *cestui que trust*, unless he has observed the utmost candor, honesty and fair dealing. *Bogie v. Nolan*, 96 Mo. 85; *Bridewell v. Swanks*, 84 Mo. 456; *Casperi v. Church*, 82 Mo. 649; *Miller v. Simonds*, 72 Mo. 669; *McClure v. Lewis*, 72 Mo. 326; *Rankin v. Patten*, 65 Mo. 378; *Garvin v. Williams*, 50 Mo. 206; *Street v. Goss*, 62 Mo. 226; *Blair v. Shaeffer*, 33 Fed. Rep. 218. (3) The court was more lenient in its judgment than the conduct of the defendant deserved. The decree provides for the repayment to the defendant of all moneys expended by him in the repair of the building. Such a provision would have been proper if the defendant had been innocent of fraud. *Shroyer v. Nickell*, 55 Mo. 264.

(4) In this case, where the defendant was guilty of practicing fraud and deception upon his principal, the court would have been justified in refusing to allow him any compensation for moneys expended in repairing the building and stripping him of all benefits derived from his contract. *Blair v. Shaeffer*, 33 Fed. Rep. 218. (5) The facts in this case were found by the chancellor in favor of the plaintiff. The credibility of the witnesses could best be determined by the chancellor, who heard them testify; and the supreme court will defer somewhat to his finding. *Cox v. Cox*, 91 Mo. 71.

*Wash Adams* also for respondent.

(1) The record discloses that the agent Rieger, by using one Mills as an ostensible purchaser, has obtained the property of his principal at about one-third of its real value. (2) The authorities seem unanimous in refusing to permit an agent to enter into a contract in which his own interest may clash with that of his principal. Pomeroy Eq. Jur., sec. 902; *Grover v. Arnes*, 9 Fed. Rep. 356. (3) The defense of champerty or maintenance at law or in equity is only available when the champertous contract itself is sought to be enforced. The existence of a champertous agreement between the plaintiff and any other person other than the defendant is no defense to a pending action. *Bent v. Priest*, 86 Mo. 475; *Pike v. Martindale*, 91 Mo. 268; *Hilton v. Goods*, L. R. 4 Eq. Cas. 432; *Elborough v. Ayers*, L. R. 10 Eq. Cas. 367; *Knight v. Bowger*, 2 De G. & J. 446; *Whitney v. Kirtland*, 27 N. J. Eq. 333; *Robinson v. Beale*, 26 Ga. 17; *McMullen v. Guest*, 6 Tex. 275; *Fetrow v. Merriweather*, 53 Ill. 275; *Railroad v. Botler*, 7 Brad. (Ill.) 625; *Gilbert v. Holmes*, 64 Ill. 548; *Torrence v. Shed*, 112 Ill. 466; 21 Cent. L. J. 37; *Burns v. Scott*, 6 Sup. Ct. Rep. (U. S.) 865; *Boone v. Chiles*, 10 Pet. (U. S.) 177; *Knadler v. Sharp*, 36 Ia. 232; *Allison v. Railroad*, 42 Ia. 274; *Small v. Railroad*, 55 Ia. 582; 8

N. W. Rep. (U. S.) 437; *Ross v. Railroad*, 55 Ia. 691; *Timont v. Railroad*, 28 N. W. Rep. 612; *Courtwright v. Burns*, 3 McCrary, C. C. 60; *Lackland v. Smith*, 7 Mo. App. 593, *Million v. Ohnsorg*, 10 Mo. App. 432; *Bent v. Priest*, 10 Mo. App. 547; *Burns v. Scott*, 117 U. S. 582; *Hovey v. Hobson*, 51 Me. 62; *Brinley v. Whiting*, 5 Pick. 348. (4) If this were not so and the charge of champerty material, the trial court purged the demand of all illegal taint, by requiring McElroy to surrender and cancel the obnoxious agreement. *Hall v. Trid*, 7 Hill (N. Y.) 586. (5) While the supreme court has not abdicated its supervisory control over questions of fact in equity cases (*Benne v. Schnecko*, 100 Mo. 250; *McElroy v. Maxwell*, 101 Mo. 294), yet, where there is a conflict of testimony much deference is paid to the finding of the court, who had the opportunity of seeing the witnesses face to face and observing their demeanor and conduct on the stand. *Mathias v. O'Neil*, 94 Mo. 520; *Sharpe v. McPike*, 62 Mo. 300; *Snell v. Harrison*, 83 Mo. 651; *Erskine v. Lowenstein*, 82 Mo. 301.

THOMAS, J.—This was a suit in equity to set aside three certain conveyances to the north twenty feet of lot 284, in block 29, Old Town, Kansas City, Missouri; the one a conveyance made by respondent to Frank V. Mills, March 14, 1887, another a conveyance made by said Mills to C. Frank Rieger, and the third a conveyance made by C. Frank Rieger to L. F. Rieger, and to reinvest the title to said lot in respondent.

The petition charges that on March 14, 1887, the plaintiff was the owner of the said property; that defendant, Lawrence F. Rieger, was then and had been for a number of years the agent of plaintiff for the purpose of looking after the repairs, paying the taxes and collecting the rents on the property; that plaintiff then lived and had for three or four years lived in the Indian Territory; that defendant, Lawrence F. Rieger,

by false representations and by concealment of material facts, induced plaintiff on the fourteenth day of March, 1887, to sell and convey this property to one Frank V. Mills for the sum of $4,500, when it was worth $12,000 ; that Mills was not a *bona fide* purchaser of the property, but the conveyance was procured to be made to him for the benefit of said Rieger; that said Mills on March 19, 1887, conveyed the property to C. Frank Rieger, brother of said Lawrence F. Rieger, for the benefit of the latter, and on June 1, 1887, the property was conveyed to the latter.

Lawrence F. Rieger filed answer in which he denied the fraud alleged against him by plaintiff, and averred that he had made improvements to the amount of $4,560.35, with full knowledge of plaintiff and without objection ; that plaintiff continued to receive purchase money after full knowledge that defendant was the real purchaser; finally, that plaintiff was not the real party in interest, but that the suit was instituted by one J. E. McElroy, a man who was in the business of undermining owners' titles, and in bringing suits for that purpose ; that said McElroy was paying plaintiff's attorneys and agreeing to pay all costs of litigation ; that the plaintiff was well satisfied with the sale, knew all the facts connected therewith and never instituted the suit. Plaintiff in his reply denied the new matter set up in the answer. For convenience hereafter when we use the word defendant we will mean L. F. Rieger alone.

The trial court found the issues for plaintiff, and found that defendant had paid plaintiff on the purchase of the property with interest the sum of $747.05, and had expended on the property for taxes, insurance and improvements the further sum of $3,419.50, making a total of $4,380.44, and that he had received rents from the property amounting to $2,540, leaving a balance in favor of defendant of $1,840.44, and divested defendants of the title to the property and vested the same in the

plaintiff and adjudged that plaintiff pay the defendant $1,840.44, which sum was made a lien on the property.

I. The first contention of appellant is that the evidence did not warrant the finding and decree of the court.

For a number of years prior to the fourteenth day of March, 1887, defendant, L. F. Rieger, had been the agent of plaintiff for the purpose of looking after the repairs, paying the taxes and collecting the rents on the property, but never agent to sell it. On the fourth day of March, 1887, the building situated upon said ground had become so dangerous that the superintendent of buildings condemned the same as being unsafe, and served upon Rieger, as agent of plaintiff, a notice requiring him by twelve o'clock the next day to either tear down or make said building safe, or suffer the penalty provided by ordinance. Rieger immediately mailed said notice to Euneau, who then resided, and had for three or four years prior thereto resided, in the Indian Territory. Euneau arrived in Kansas City on the eighth or ninth of March. He came to Kansas City for the sole purpose of looking after said building. While there he made a personal examination of the building, saw its condition and surroundings, saw that it was dangerous. Euneau had a contractor to make estimates on the building looking towards having it repaired. From Rieger, and the contractor, he learned it would cost to repair the building $3,000 or $3,500.

Plaintiff paid $6,000 for the property when he obtained title to it, and he was receiving $125 per month rent for it. Owing to the condition the building was in, he concluded to sell, and he asked Rieger to sell it for him. We will let Rieger tell what was then done in his own language. He testified as follows: "I says, 'what is your idea about what you would want for it?' I says, 'I guess I can get $4,500 for it;' he agreed to sell for $4,500. He asked me if I would take it and sell it for him, and I told him yes; he wanted to know how

long it would take; he said he should put the price down low so as to make the sale that day.

" *Q.* Was that the day the authority was signed for you to sell? *A.* Yes, sir.

" *Q.* That is the one ( showing witness paper )? *A.* Yes, sir; that is the order he signed at that time; that was on Monday, and, on my way to dinner that day, I stepped into the store where Mr. F. V. Mills worked, and told Mr. Mills that I had a piece of property for sale.

" *Q.* That was your brother's store, was it? *A.* Yes, sir; that I thought there was some money in it; he wanted to know where it was, and how much money it would cost, and the terms, and I told him the terms; the same terms I had received authority to sell for— $4,500."

The court: "You told who that? *A.* Mr. Mills; I remarked to him, 'Now,' I says, ' this property is a little out of shape, and it will take some money to fix it up,' 'a few hundred dollars;' he says, 'Well, Rieger, I don't want to go into anything of that kind, maybe it will cost more money to fix it up than you think it will;' I says, ' Well, in case you find it is going to cost you more than you think, and more money than you can make arrangements for, let me know, and I will take it off your hands;' he says, 'With that provision, then, I will take the property, provided you will stand by me if I get into a tight place;' I says, 'All right;' he says, 'I have not got any money;' he says, 'I will have to get the money from my mother to buy this property.'

" *Q.* Where does she live? *A.* In Sedalia; I had learned before that, that he could get money if he wanted it, and I asked him if he had $500; he said, 'No;' I told him that I would take $500 on that property; 'well,' he says, 'If you will advance me $500, when I get my money I will get enough money to pay the $500, pay half the purchase money;' we signed the contract with that understanding, and I went over to the

office, and made a due bill out, and put it in the drawer, for $500, due from Mills, to pay·on the contract, and put it in the safe; the next day Mr. Euneau came in and said, 'Rieger, have you succeeded in selling the property for me, and got me out of trouble?' I says, 'I think so;' he wanted to know who I sold it to; I says, 'F. V. Mills;' I says, 'Euneau, I have agreed with Mr. Mills that, in case he should find the building in any worse shape than I had represented it, or find out after he examined it;' I says, 'I will agree to take it off his hands;' I says, 'he is a good friend of mine, and I want to protect him;' Mr. Euneau says, 'It don't make any difference to me, I want to get clear of it, it is a big bother to me;' I says, 'Well, that is the way I have succeeded in making the trade.'

"Q. Right there did you show him the contract? A. Yes, sir; I showed him the contract; I says, 'Now, since I may come to have some interest in this case,—in case Mills backs out of it,' I says, 'you sign this contract; I have signed it as agent for you; you sign it, so that if I should have to take it off Mr. Mills' hands, you sign it yourself;' he says, 'All right;' he signed it; he says, 'Did you get the money?' I says, 'I have advanced $500 for Mr. Mills, the purchaser, and I will get all the money from Mr. Mills as soon as the deed comes back, as soon as everything is ready to close up;' Euneau says, 'Give me that $500, then I will feel sure that the trade is made and I am out of that building.'

"Q. Who is Mr. Mills? A. He is a young man that works in my brother's hat store, at 608 Main street, formerly from Sedalia, Missouri.

"Q. At what salary was he working? A. I don't know.

"Q. He had no means, had he? A. I don't know.

"Q. He had never bought any property that you know of? A. Not to my knowledge. * * *

"*Q.* You did not know of his having any money ?
*A.* No, sir.

"*Q.* You went to Mr. Mills, who was in your brother's employ, and told him you had a piece of property that you thought was reasonable ? *A.* Yes, sir.

"*Q.* At $4,500 ? *A.* Yes, sir.

"*Q.* He told you that he would take it without looking it over ?. *A.* Yes, sir, after explaining to him ; I told him it was a little out of shape, described it to him, and said I would take it off his hands if he found out he didn't want it, and it was in a worse condition or out of shape more than he expected to find it.

"*Q.* How long after this contract was signed before he told you he would not take the property ? *A.* That was on the fourteenth ; I think it was either the six-teenth or seventeenth of March.

"*Q.* On the sixteenth or seventeenth of March, he told you he wouldn't take the property ? *A.* Yes, sir.

"*Q.* In 1887 ? *A.* Yes, sir.

"*Q.* So you knew, on the sixteenth or seventeenth of March, that you would be the purchaser of the property ? *A.* Yes, sir.

"*Q.* What day did you receive the deed from Euneau ? *A.* I think it was on the nineteenth.

"*Q.* What day did Mills make the deed to C. Frank Rieger ? *A.* The nineteenth of March.

"*Q.* Then you conveyed the property, so that, in case there was any damage, you would be relieved ? *A.* I had Mr. Mills convey it to him ; yes, sir.

"*Q.* Then, as a matter of fact, the very day that this property was conveyed by Mills to Frank Rieger, you, yourself, were the owner of it ? *A.* Yes, sir.

"*Q.* That was on the nineteenth of March ; isn't it a fact, Mr. Rieger, when you went to Mr. Mills to buy this property, that it was simply your design and purpose to get him to hold the title for you ? Wasn't that the object of it ? *A.* No, sir.

"*Q.* Did you not know all the time that you were going to be the purchaser of the property, and wasn't it your object to secure the title to the property yourself by putting it in Mills' name? *A.* No, sir.

"*Q.* Mr. Mills, as a matter of fact, didn't pay you a single dollar, at the time and didn't afterwards? *A.* Never; he didn't pay me anything.

"*Q.* When was the first time you ever notified Mr. Euneau that you were the owner of that property? *A.* The first time I ever notified him?

"*Q.* Yes? *A.* The twenty-second day of December, 1887.

"(This suit was brought on the eleventh day of January, 1888.)

"*Q.* That was the first time you had ever notified him? *A.* Yes, sir.

"*Q.* Had you intentionally kept that concealed from him during that time? *A.* No, sir.

"*Q.* How does it happen that the deed from Frank Rieger to you, which was dated June 1, 1887, wasn't put upon record? *A.* I don't know exactly.

"*Q.* You don't know how that didn't happen to be put upon record? *A.* No, sir; I didn't know but what it was recorded, until after the suit was brought. * * * It was left in my safe, I have other deeds in there we have not recorded; there wasn't any necessity of putting it upon record. * * *

"*Q.* You told him (plaintiff) of having bought his property the twenty-second of December, 1887. *A.* Yes, sir.

"*Q.* You had frequent correspondence with him in the meantime, did you not? *A.* No.

"*Q.* You hadn't? *A.* I believe there had been two or three letters passed.

"*Q.* Had you mentioned it in any of the letters you wrote him? *A.* No; I don't believe I had, because I didn't want to write any letter that I owned that

Euneau v. Rieger.

property, and then at the same time have it conveyed to some one else. * * *

"Q. Why didn't you tell him in some of those let-ters that you wrote to him between March, 1887, and December, 1887, the fact that you had purchased that property from Mills? A. I didn't see any necessity of telling him. * * *

"Q Why did you not say to Mr. Euneau at that time (March 23) that you wrote that letter; I have now become the owner of that lot; have taken it off the hands of Mr. Mills. You were his agent were you not? A. Yes, sir.

"Q. Why did you not tell him about that prop-erty, Mr. Rieger? A. Because I didn't want it known I was the owner of the property.

"Q. When Mr. Mills refused to take this property, the deed seems to have been made to your brother? A. Yes, sir.

"Q. Explain to the court why it was deeded to your brother instead of yourself? A. I looked upon the thing as having considerable liability attached to it, and, in case it would fall down, there would be endless lawsuits growing out of the matter if it fell, and hurt anybody; I knew there were a great many people around there all the time, and I knew it would be impos-sible for that building to fall down and not hurt some-body, so I had the deed taken in my brother's name; so that if the building was to fall, and lawsuits came up, that all that would be lost in the lawsuits would be this property, because the property would be out of my hands. That was a matter of precaution to protect myself.

"Q. (By the court): Was the deed from Euneau to his brother?

"Mr. Tichenor: From Euneau to Mills, and from Mills to his brother.

"Q. (By Mr. Tichenor): Had your brother anything to protect himself; had he any property? A. Yes; he had some property around town.

"*Q.* Was it worth much? *A.* No, sir; I guess he had property worth about probably $3,500 or $4,000.

"*Q.* What did he do with it? *A.* We had talked about the matter. I explained to him what condition the property was in, and asked him if I could put it in his name; I told him I didn't like to be mixed up with damage suits. He says, 'Yes,' and then he made me a deed to what property he had in town, and I put that deed in my safe, and had Mr. Mills make this deed to my brother, so that if the building should fall down, and anyone should undertake to show that the building was mine, or that the property was mine, that I could get these deeds and show the consideration to my brother,—show that the property had been deeded to him for a consideration.

"*Q.* That was done to protect yourself? *A.* That was it.

"*Q.* You did what you did so that in case he was mulcted in damages he would not be liable? *A.* Yes, sir."

The letter of defendant to plaintiff of March 23, 1887, is as follows:

"March 23, 1887.

"*Mr. Louis Euneau, Grand River, I. T.*

"DEAR SIR:—I send you a statement of your account which shows that I have on hand for you the sum of $2,557.05, which I will loan out for you as soon as I can on good security. I also have on hand for you the two notes for $2,250 given by the party that bought the real estate. These notes bear eight-per-cent. interest and are payable on or before one and two years after date. The party that bought the property does not think much of his bargain and wants to sell it again. What do you think of it? would you like to own any such property again? Write as soon as you get this statement, so that I may know everything is all right.

"Yours, etc.,

"L. F. RIEGER."

We think this testimony of defendant shows conclusively that he, and not Mills, was from the start the real purchaser of the property from plaintiff. It is remarkable that he would go to Mills, a clerk in his brother's store, and ask him to take the property at $4,500. Mills was not a dealer in real estate. Defendant apparently adopted a passive policy in regard to the disposition of the property. No attempt was made to get more than $4,500. It is true, plaintiff had authorized defendant to sell at that figure, but agents acting in good faith ordinarily first ascertain what they can get, and then finally fix the figure to suit the market within the limits of their authority. But here defendant immediately sought a clerk in a hat store and bargains the property to him without his having seen it, and loaning the cash payment himself. The property, we think, was proven to have been worth at that time at least $12,000. The deed to Mills was written March 14, 1887. Plaintiff returned to his home in the Indian Territory, he and his wife signed and acknowledged the deed, and it was returned, reaching defendant on the nineteenth. On the sixteenth or seventeenth of March, Mills backed out of the bargain, and, on the same day the deed was delivered to him, conveyed the property to C. Frank Rieger, defendant's brother for defendant's use.

Such a transaction as this, even taking defendant's version of it, cannot stand judicial scrutiny. The utmost good faith of an agent towards his principal must be maintained. This conveyance to Mills ought to be set aside at the option of plaintiff so long as the parties can be put *in statu quo.* Mr. Rieger was acting as plaintiff's agent in respect of this property. He was a real-estate agent in Kansas City, and no doubt had had ample opportunities to know not only the value of this property but all property in that city. He got the title of his principal, not directly, but by indirection, to property worth $12,000, for $4,500.

One cannot read the evidence contained in this record without concluding that plaintiff entertained an exaggerated notion of the peril he was in from the dangerous condition of the building on the premises. He had paid $6,000 for the property, and defendant says he was willing to sell it for $4,500, even fixed that price for it in the first instance, because "he was afraid the building would fall down and would hurt some one, and he would be held liable for damages against him." When plaintiff offered to sell for $4,500, defendant did not suggest that that was not enough, but said he thought he could find a purchaser at that price. We will not stop to inquire whether defendant caused plaintiff to have this exaggerated idea respecting the danger of the building falling. It is enough to know that he had such an idea, and that defendant knew he had it, and by means of it was enabled to overreach, and did overreach, plaintiff and get his property for a sum much less than half its value. The defendant saw that plaintiff had his mind directed to damages that might result from the building falling, and, while his attention was thus diverted to an incident of the property merely, the defendant acquired the property itself.

Defendant says he informed plaintiff at the time that Mills might not take the property, and if he did not defendant would take it, and that plaintiff expressed indifference as to who got the property so he got his price. If defendant really thought that plaintiff was indifferent about who purchased the property his letter to plaintiff under date of March 23 is inexplicable. Mills had then backed out, and yet he wrote plaintiff thus: "I also have on hand for you the two notes given by the party that bought the real estate. These notes bear eight-per-cent. interest, and are payable on or before one and two years after date. The party that bought the property does not think much of his bargain, and wants to sell it again. What do you think of it; would you like to own any such property

again ?" Can defendant, can anyone, explain or excuse such language of an agent to his principal under the circumstances disclosed by defendant himself? This letter not only suppressed the truth, but also suggested a falsehood. It proves the *mala fides* of defendant, in fact. He was plaintiff's agent in respect of this property, and it was his duty as such to get as much for it as possible, and the law will not permit him to reap an advantage he has acquired by reason of this confidential relation. Nor does it make any difference that plaintiff may have known that defendant was to become the owner of the property in a certain contingency, and that he did in fact become the owner of it.

The only question, a court of equity will ask, in the investigation of transactions between parties sustaining a confidential relation to each other, is whether an advantage has been obtained by one of them by virtue of that relation and whether the parties can be restored to their original *status*. The fairness or unfairness of the transaction will not be allowed in such case. An agent cannot serve two masters. If he undertakes to act for himself, and at the same time for his principal, and reaps an advantage by his double dealing, the law will take it from him, unless the principal knowing all the facts has allowed the agent to so change his condition that he cannot be put *in statu quo*, and thus make it inequitable to rescind the contract. Mr. Justice SWAYNE, in *Michoud v. Girod*, 4 Howard, 503, uses this language : "The agent must refrain from placing himself in relations, which ordinarily excite a conflict between self-interest and integrity. The disability is a consequence of that relation between the parties, which imposes on one the duties to protect the interest of the other ; from the faithful discharge of such duty his own personal interest may withdraw him. In this conflict of interest the law wisely interferes. It acts not on the possibility that in some cases the sense of that duty may prevail over the motive of self-interest, but

the danger in all cases, that the dictates of self-interest will exercise a predominant influence and supersede that duty."

Lord CHANWORTH's remarks in the house of lords in *Railroad v. Blakis*, 1 McQueen, 461, are pertinent here. He said: "An agent has duties to discharge of a fiduciary character towards his principal, and it is a rule of universal application that no one having such duties to discharge shall be allowed to enter into engagements in which he has or can have a personal interest conflicting, or which possibly may conflict with the interest of those whom he is bound to protect. So strictly is this principle adhered to, that no question is allowed to be raised as to the fairness or unfairness of the contract." Story, in his work on agency [9 Ed.] section 210, says: "In matters touching the agency, agents cannot act so as to bind their principals, where they have an adverse interest in themselves. This rule is founded upon the plain and obvious consideration that the principal bargains, in the employment, for the exercise of the disinterested skill, diligence and zeal of the agent for his own exclusive benefit."

Discussing the same subject, Mr. Pomeroy says: "Equity regards and treats this relation in the same general manner, and with nearly the same strictness, as that of trustee and beneficiary. The underlying thought is that an agent should not unite his personal and his representative characters in the same transaction; and equity will not permit him to be exposed to the temptation or brought into a situation where his own personal interests conflict with the interests of his principal, and with the duties he owes to his principal. In dealings without the intervention of his principal, if an agent for the purpose of selling property of the principal buys it himself, or an agent for the purpose of buying property for the principal buys it from himself, either directly or through the instrumentality of a third person, the sale or purchase is voidable; it will always be

set aside at the option of the principal ; the amount of consideration, the absence of undue advantage and other similar features are wholly immaterial; nothing will defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts. Passing to dealings connected with the principal's intervention in any contract of purchase or sale with the principal, or other transaction by which the agent obtains a benefit, a presumption arises against its validity which the agent must overcome ; although this presumption is undoubtedly not so weighty and strong as in the case of a trustee. The mere fact that a reasonable consideration is paid, and that no undue advantage is taken, is not of itself sufficient. Any unfairness, any underhanded dealing, any use of knowledge not communicated to the principal, any lack of perfect good faith which equity requires, renders the transaction voidable, so that it will be set aside at the option of the principal. If, on the other hand, the agent imparted all his own knowledge concerning the matter and advised his principal with candor and disinterestedness, as though he himself were a stranger to the bargain, and paid a fair price, and the principal on his side acted with full knowledge of the subject-matter of the transaction, and of the person with whom he was dealing, and gave a full and free consent,—if all these are affirmatively proved, the presumption is overcome, and the transaction is valid." Pom. Eq. Jur., sec. 959.

We quote thus copiously from these authorities to show how equity regards transactions between agents and principals in general. Defendant in the transaction under review did not act with candor and fairness towards plaintiff. As soon as he got him to sign a memorandum authorizing the sale of the property for $4,500 he went directly and obtained a *straw* purchaser ; advanced the cash payment to him ; had taken the trade off of this straw purchaser's hands before plaintiff had acknowledged the deed ; got the property for less

than half its value, and after he had thus got it he writes his principal that the purchaser did not like his bargain, and wanted to sell the property. A court of equity cannot sanction such conduct. This transaction ought to be set aside. The trial court did set it aside, and we do not see how it could have done otherwise.

Defendant's attorneys contend, however, that their client made valuable improvements on the property with the full knowledge of plaintiff. Plaintiff denies that he knew that defendant was the owner of the property, until a very short time prior to the institution of this suit. Be that as it may, it makes no difference in this case. The court put the parties *in stalu quo* by giving plaintiff the property and adjudging that he pay defendant what he had expended on it, after deducting rents received.

In the consideration of the case thus far we have left out of view plaintiff's version of this transaction. We did this because we felt that defendant's own testimony authorized the decree of the trial court. An attentive perusal of plaintiff's testimony, however, has strengthened the conclusion we have reached. There can be no question that plaintiff had implicit confidence in defendant, and trusted him in this transaction to a marked degree. Plaintiff has some Indian blood in him, and is a member of a tribe of Indians, and lived on a farm in the Indian Territory. He had but little information or knowledge in regard to real-estate values in Kansas City though he had been raised there. John Campbell had been his curator during his minority, and had conveyed the property involved in this controversy to plaintiff in payment of $6,000 he owed him as such curator. Campbell at the time of this transaction owned property adjoining this in dispute. His building had been condemned at the same time plaintiff's was condemned, and yet plaintiff failed to see him and get his advice in regard to the property, although it appears he was his friend. Campbell testified that he went to

see defendant as the agent of plaintiff in regard to repairing the building, and he upbraided defendant for letting plaintiff sell his property so low, and that he told defendant he (Campbell) would have given $10,000 cash for it. The time when Campbell told him this is not definitely fixed by the evidence, but it must have been after the contract bargaining the property to Mills for $4,500 had been signed and before plaintiff left for the Indian Territory, which was on the fifteenth of March; for Campbell testified that defendant at that time told him plaintiff was then in Wyandotte (which is in fact a part of Kansas City). It is true defendant denies this, but we feel that the court was well justified in believing Campbell rather than defendant. The court has to scrutinize closely the testimony of a man who goes into a court, and swears that he put his property in the name of his brother to avoid liability for damages that might result from the building falling, and, in order that he might show a consideration if the transaction was ever questioned in court, he had his brother convey his property to defendant. He concocts two sham conveyances to deceive the courts, and the inference is irresistible that he stood ready to swear that those conveyances were not shams if it became necessary. We cannot rely on the testimony of such a man where he has an interest at stake. Campbell had no manner of interest in this contest. He swears that he told defendant that he would give $10,000 cash for this property, and this statement was made we feel satisfied before the deed was delivered to Mills. Yet defendant took the property of his unsuspecting victim for $4,500, when he knew he could get $10,000 for it by simply speaking to Campbell. This again convicts defendant of *mala fides*.

Again, McElroy swears he offered defendant $12,000 for the property on the twenty-first day of March, three days after Mills had conveyed it to his brother. Defendant denies this but he insists that, even conceding

that this offer was made, still the contract was then closed, and he was not bound to give his principal the benefit of it. We do not concur in this. Defendant was *then* the agent of plaintiff; for, on March 23, he wrote plaintiff that *he* held the notes of the purchaser for the purchase money. Defendant had at that time devised a scheme by which liability for damages from the building falling was removed. We think it was his plain duty to have informed plaintiff of the new environment, and of this offer, and his failure to do so again shows his bad faith. We do not assert with much confidence, however, that this offer was in fact made. We have shown how prone defendant is to protect his interests by any method his ingenuity could invent; but at the same time we must not forget that McElroy was a rival real-estate agent of defendant in Kansas City, and that he took a leading part in the instigation of this litigation, and was at the time of the trial directly interested in the result as will appear more fully hereafter. Defendant and McElroy probably stood on the same moral plane. Their veracity was put in issue. The trial judge saw them and heard them testify, and it was peculiarly his province to determine which one he would believe. If this offer was made, defendant's conduct becomes more reprehensible; if it was not, there is enough other testimony upon which to uphold the decree in the case, as has been shown.

II. Defendant contends that the plaintiff's bill ought to have been dismissed, because it appeared at the trial that the suit was being prosecuted under a champertous contract with J. E. McElroy.

It very clearly appears that McElroy instigated this suit. He went to Seneca in the Indian Territory, and finally induced plaintiff to bring the action by paying him $1,000. On the sixteenth day of January, 1888, plaintiff gave McElroy a power of attorney duly acknowledged and recorded, which after reciting the institution of this suit contained the following stipulation: "In consideration of the above premises, and

the sum of $1,000 paid me by said James E. McElroy
of said city, and for the further consideration that said
McElroy does agree to give his close attention to the
prosecution of said suit, getting up the evidence therein,
and doing all things proper for him to do, and neces-
sary to prepare the same for trial, and which things I
cannot conveniently do, because of the distance of my
residence from the court where said suit is pending, I,
said Euneau, by these presents irrevocably nominate,
constitute and appoint said McElroy my true and law-
ful attorney for me, and, in my name, to prosecute said
suit to a conclusion, and if the same shall result favor-
ably to me, and I shall be restored to the possession and
title to said property, then, and in that event, I agree
to give to said McElroy, and his assigns, and personal
representatives a sum of money equal to one-half the
value of said property so recovered, as a consideration
for above recited premises." It further appeared that
McElroy agreed to pay all the expenses, including
attorney's fees, of the litigation.

When this state of facts was developed on the trial,
at the suggestion of the court, plaintiff and McElroy
rescinded this contract in *toto*, and the latter paid back
to the former the $1,000 he had received, and defend-
ant's contention is that the court, instead of permitting
this, ought to have dismissed the bill.

That this contract was very reprehensible there can
be no question. That it partakes of both champerty
and maintenance is manifest. Relatives and friends of a
party may often with great propriety interfere, and not
only advise litigation, but also furnish the means to
carry it on. For instance, if Campbell, the former cura-
tor and friend of plaintiff, had advised this action and
even aided its prosecution with money, if plaintiff was
unable to prosecute it, there would have been nothing
reprehensible in his conduct if he had honestly believed
defendant had swindled plaintiff. But McElroy was a
stranger to plaintiff, and he must have been actuated

by two motives in this transaction : *First.* To down a rival real-estate agent, and, *second,* to reap a profit himself. This contract could not have been enforced at law. But is defendant in a position to complain of it and take advantage of it? The question in issue in this litigation is whether plaintiff has a good cause of action; not whether he was prompted by improper methods to institute the suit. As we have seen, plaintiff is entitled to a decree vesting the title to the property in him, but defendant says he did not institute the suit of his own motion, but was induced to do it by McElroy's paying him $1,000, and agreeing to pay the expenses. BLACK, J., in *Bent v. Priest,* 86 Mo. 475, says: "Unless the plaintiff's title, by which he seeks to enforce a right, is infected by a champertous contract, we see no reason why the suit may not proceed, though such a contract exists as between plaintiff and his attorney. It is time enough to turn a party out of court when he asks the aid of a court to enforce such a contract." This language was quoted and approved by RAY, J., in *Pike v. Martindale,* 91 Mo. 268. This, we take it, is now the settled rule in Missouri, and is supported by a decided weight of authority elsewhere. *Hilton v. Woods,* L. R. 4 Eq. Cas. 432 ; *Elborough v. Ayres,* L. R. 10 Eq. Cas. 367 ; *Knight v. Bowyer,* 2 De G. & J. 446 ; *Whitney v. Kirtland,* 27 N. J. Eq. 333 ; *Robinson v. Beall,* 26 Ga. 17 ; *McMullen v. Guest,* 6 Tex. 275 ; *Fetrow v. Merriwether,* 53 Ill. 275 ; *Railroad v. Botler,* 7 Brad. ( Ill.) 625 ; *Gilbert v. Holmes,* 64 Ill. 548 ; *Torrence v. Shedd,* 112 Ill. 466 ; 21 Cent. L. J. 37 ; *Burnes v. Scott,* 6 Sup. Ct. Rep. (U. S.) 865 ; s. c., 117 U. S. 582; *Boone v. Chiles,* 10 Pet. ( U. S.) 177 ; *Knadler v. Sharp,* 36 Ia. 232 ; *Allison v. Railroad,* 42 Ia. 274 ; *Small v. Railroad,* 55 Ia. 582 ; 8 N. W. Rep. ( U. S.) 437 ; *Ross v. Railroad,* 55 Ia. 691 ; *Vimont v. Railroad,* 28 N. W. Rep. 612 ; *Courtright v. Burnes,* 3 McCrary, C. C. 60 ; *Hovey v. Hobson,* 51 Me. 62 ; *Brinley v. Whiting,* 5 Pick. 348 ; 19

Euneau v. Rieger.

Cent. Law Jour. 402 ; *Hall v. Gird*, 7 Hill ( N. Y.) 586. Note by Judge Thompson, 13 Fed. Rep. 323.

Aside from this principle, however, the parties canceled the contract, and hence the trial resulted in the restoration of all the parties to their original situation in respect of this property. McElroy caused the rescission of the conveyance of the property to defendant, and defendant caused the rescission of the contract between plaintiff and McElroy.

Defendant and McElroy seem to be opposing forces in the real-estate business in Kansas City, and it seems they have been enabled so far to make each other conform to the rules of fair dealing. Whether they will continue their surveillance of each other until they are both thoroughly reformed or not, we cannot tell. The judgment is affirmed. All of this division concur.