OTTO MEYER et al., Respondents, v. JOHN W. CORLEY PUBLISHING & PROMOTION COMPANY et al., Appellants.

St. Louis Court of Appeals. Argued and Submitted December 2, 1913. Opinion Filed December 31, 1913.

1. **PRINCIPAL AND AGENT: Fraud of Agent and Third Party: Rights of Principal.** If a third party contracting with an agent agrees to pay him a commission or other reward for making or bringing about the contract, or agrees to give him a part of the price to be paid by the principal, the contract is voidable at the option of the principal, but it is not void, and the third person cannot avoid it if the principal chooses to hold him.

2. ———: ———: ———: **Bailments.** In an action for the value of a horse which was bailed to defendant through its agent and not returned to plaintiff, where plaintiff admitted that he and the agent had a secret understanding by virtue of which a certain part of the hire paid by defendant was to

be given to the agent by plaintiff, *held* that plaintiff was not entitled to recover, since the secret agreement was a fraud upon defendant, relieving it from liability as bailee.

3. **JUSTICES' COURTS: Pleading: Defenses.** In an action on a contract made for defendant by its agent, begun in a justice's court, where no formal pleadings are required, defendant could defend on the ground of illegality of the contract, as being collusive between its agent and plaintiff, without pleading such illegality, even in the circuit court, on appeal.

Appeal from St. Louis City Circuit Court.—*Hon. Eugene McQuillin*, Judge.

REVERSED.

*Lehmann & Lehmann* for appellant John W. Corley Publishing and Promotion Company.

Where the agent of one party to a contract receives a secret commission from the other party thereto, the enforcement of such contract is against public policy. One who bribes an agent to make a contract for his principal can enforce no rights arising out of said contract against the principal. McClure v. Ullman, 102 Mo. App. 697; De Steiger v. Hollington, 17 Mo. App. 382; City of Findlay v. Pertz, 66 Fed. 427; Donovan v. Campion, 85 Fed. 71; Black v. Miller, 71 Ill. App. 342; Whitley v. James, 121 Ga. 521, 49 S. E. 600; Clark and Skyles on Agency, 1905 Ed., Section 456; Panama & South Pacific Co. v. India Rubber Co., 10 Ch. 15, 32 L. T. Rep. N. S. 517.

*Charles M. Polk* for appellant publishers, George Knapp & Co.

(1) One of the essential elements of a bailment is the delivery of the thing bailed. The burden of proof was on respondents to show the delivery of the horse claimed to have been delivered in this case. No delivery was shown in this case. 5 Cyc. 161; Von Zile v. Bailments, par. 19; Evans v. Automobile Co., 121 Mo.

App. 266; Prince v. Cotton Compress Co., 112 Mo. App. 49; Baker v. Railroad, 52 Mo. App. 602; Feltman v. Gulf Brewery, 42 How Pr. 488. (2) The burden of proof was on respondents to show that the Corley Company or its employee had authority to hire the horse from respondents for or in the name of this appellant. The declarations of such employees are not competent for such purpose. Oil Co. v. Zinc Co., 98 Mo. App. 324; Jolly v. Huebler, 132 Mo. App. 675. (3) It was the duty of respondents to inquire into and determine the real authority of the employees of the Corley Company. Kilpatrick v. Wiley, 197 Mo. 123. (4) Unless appellant did hire the horse from the respondents, or negligently or wrongfully mistreated it and thereby occasioned its death, this appellant is not responsible for the failure to return it.

*Hiram N. Moore* for respondent.

REYNOLDS, P. J.—Plaintiffs, a partnership composed of Otto Meyer and James Helm, commenced their action before a justice of the peace of the city of St. Louis against John W. Corley Publishing & Promotion Company, a corporation, hereafter referred to as the Corley Company, and Publishers George Knapp & Company, a corporation, the latter publishers of a newspaper called The St. Louis Republic, this defendant hereafter referred to as the Republic. It is set out in the statement filed before the justice that plaintiff "for hire let to defendants one certain bay horse of the value of $200, which was to be returned on the evening of said day and that defendants have failed and refused to so return the same, although demanded so to do." Judgment is asked for $200 and costs. Judgment went against both defendants for the amount claimed, from which judgment they appealed to the circuit court, where on a trial anew before the court and a jury, defendants, as before the justice, interpos-

ing no written pleading, judgment went against both defendants. Interposing motions for new trial and excepting to the action of the court in overruling them, defendants have duly perfected their appeal to this court.

It appears that the Republic entered into a contract with the Corley Company, by which it authorized the latter to canvass for subscriptions for its daily and Sunday issues in St. Louis and vicinity, authorizing the Corley Company to offer a lady's or gentleman's watch as a premium in connection with all subscriptions taken by responsible parties who will contract to take the daily and Sunday Republic for a period of eighteen months, such subscribers to pay $1.50 on delivery of the watch and eighty cents per month thereafter for eighteen consecutive months. One of the conditions named in this contract was that the Corley Company was to organize and conduct the entire canvass, paying all the expenses thereof, including the manager, solicitors, delivery men and delivering the premiums to subscribers. After this contract was entered into the Corley Company commenced the work of canvassing for subscribers, etc., doing the canvassing by means of agents. It appears that the Corley Company placed this business of canvassing in charge of a man named Beck; at least Beck appears to be the one who had charge of hiring the teams for the work. Beck, representing to plaintiffs that he would require from four to five teams a day, made an arrangement to hire the teams needed in this work from plaintiff, at the agreed price of $2.50 per day for each team. It was agreed that Beck would notify plaintiffs at their livery stable, either by going there in person or by telephone, of the number of horses and buggies desired on a given day, the teams to be delivered on the street in front of or along the side of the Republic office at Seventh & Olive streets, in St. Louis. One of the partners, Mr. Helm, asked Beck for whom he was hiring these teams.

Beck told him that it was for the St. Louis Republic; that he was securing subscriptions for that paper. According to the arrangement horses and buggies were delivered from time to time in front of or along the side of the office of the Republic in the morning and would be returned to plaintiffs about six o'clock in the evening. The teams were delivered through men or boys employed by respondents. The bills for the teams were made out to the Republic but were delivered to and paid by Beck at the Republic office, except on one occasion when they appear to have been paid at the office of the Corley Company. It was the custom that when employees of the livery stable drove the teams to Seventh and Olive, they hitched the horses and went up into a room or office of the Republic Building, marked "Circulation Department," and told whoever they found there that the teams were ready. That was done on all occasions with practically few exceptions. One exception was on May 27, 1911. On that day, however, plaintiffs, in usual course and under orders from some one at the Republic office, sent out a horse and buggy and as usual placed it on Seventh street in front of the Republic office. It does not appear that the driver, who on this occasion took the rig to the usual place, notified anyone in the Republic office that it was there. He drove it up, hitched, it as usual and left. The next known of this rig was that night when the horse was found lying dead near a drinking trough in one of the parks of the city. There was testimony to the effect that the horse and buggy had been driven there by two young men, apparently eighteen or twenty years of age, and the persons who saw it when at the trough noticed that the horse was covered with lather, was heaving, and had every appearance of having been overdriven. No one identified the young men as having any connection with either of the defendants; neither of them, however, corresponded in appearance to Beck, who was a man of

about thirty-five years of age. Beck left the city some time after the death of the horse, and was not produced as a witness in this case. There was testimony to the effect that the horse was worth $200, possibly more.

During the cross-examination of one of the plaintiffs, Mr. Helm, it developed that he was the one who had made the arrangement with Beck for hiring these teams; that the price to be paid for them by the Republic was $2.50 a day, but that plaintiffs had made an arrangement with Beck whereby they were to give and did give Beck twenty-five cents of this $2.50 on each team. That, said the witness, was a private arrangement between himself and Beck. His firm had charged up the livery in the bills rendered to the Republic at $2.50 a day. Beck would send up the money and pay plaintiffs or come up and pay it, and his commission would be paid by plaintiffs, or he would send up and get the money and come out and pay it, and his commission was paid him. Mr. Helm testified that so far as he knew, nothing had taken place between him or his firm and Beck that would indicate that Beck was turning this commission over to his employers; Beck would simply go into the office of the Republic, get the money, come outside and pay the bill for the teams, which were always billed for the full amount. Asked if he knew that the people Beck was working for did not know anything about Beck getting this cash commission, Mr. Helm answered: "That was his lookout, not mine. He was working for the St. Louis Republic, so he told me, and I never knew nothing different from anybody else." He further testified that he made out the bills to the Republic for the full amount and gave Beck twenty-five cents a team on each day's livery in cash. Beck paid the bill in full to plaintiffs and they would give him back the twenty-five cents in cash. Asked if that twenty-five cents was Beck's personal perquisite, Mr. Helm said he did not know. Asked if

that was his assumption, he answered that that was his opinion of it.

At the close of plaintiffs' evidence in chief, in which the foregoing testimony had been given, defendants asked an instruction that, "It being admitted by plaintiffs that they paid the alleged servant of defendants a secret commission for driving the horse in question in this case, the plaintiffs are not entitled to recover and your verdict must be for the defendants." This was refused, defendants excepting. An instruction asked at the close of all the evidence in the case was to the effect that if the jury found and believed from the evidence that at the time in question Beck was hiring the horse and wagon ostensibly as agent for and on behalf of defendant Publishers, George Knapp & Co., but actually in behalf of the Corley Publishing Company and was receiving a secret commission from plaintiffs, then plaintiffs are not entitled to recover and their verdict must be for defendants. This was refused, defendants duly saving exception.

Plaintiffs having closed their evidence in chief, their counsel stated to the court that this was a case of bailment and he believed he would rest for plaintiff; that, the burthen of proof now shifted upon defendants and he would rest his case there; that the burden in the case of bailment shifts when the plaintiff makes out a case of delivery and failure to return; that he had shown that overwhelmingly and the burden of proof now shifts to defendants. Following out this same theory, that this is an action on a contract of bailment, the first instruction asked by plaintiffs began thus: "If you believe and find from the evidence in this case that plaintiffs on or about the 27th day of May, 1911, delivered and hired to defendant a certain bay horse," etc. The argument which the learned counsel for respondents has presented to us begins with the statement that, "This case involves the value of a horse alleged to have been bailed to the

appellants, the horse having been killed while in the possession of appellants.'' There is therefore no question but that the case was presented and tried on the theory of a contract of bailment. It is to be determined then on the principle applicable to contracts.

The evidence of one of the plaintiffs, testifying as a witness for plaintiffs in this case, demonstrates beyond room for doubt, that the bargain between the agent who hired these teams, and one of the proprietors of the livery stable from whom that agent obtained them, was a corrupt agreement as between those parties.

It is said in an accepted work on the law of agency: ''If an agent in contracting with a third person on behalf of his principal is guilty of a fraud upon the principal, or breach of trust, to which the third party is privy, or if the third party enters into an agreement with an agent to pay him a commission or other reward for making or bringing about the contract, the contract is voidable at the option of the principal. It is not void, and the third person cannot avoid it if the principal chooses to hold him, but the principal may repudiate it because of the fraud.'' Clark & Skyles on Agency (1905 Ed.), sec. 456.

The appellate courts of our State have spoken in no uncertain terms on this same proposition. One of the earliest cases and a leading one in our State on this, is that of DeSteiger v. Hollington, 17 Mo. App. 382. There it is said by Judge ELLISON (l. c. 388): ''So jealous is the law as to the relation between principal and agent, that in passing on questions of this character, arising between them, the mere fact of the discovery of no actual fraud or bad faith does not relieve the case in the least. 'The cases are nearly if not quite uniform, where the double employment exists and is not known. No recovery can be had against the party kept in ignorance and the result is not made to turn on the presence or absence of designed duplic-

ity and fraud, but is a consequence of established policy.' [Scribner v. Collar, 40 Mich. 375.] The same principle is well expressed in the case of Everhart v. Searle, 71 Pa. St. 256. It is said in that case that, 'it matters not that there was no fraud meditated and no injury done; the rule is not intended to be remedial of actual wrong, but preventive of the possibility of it.' And to the same effect is Rice v. Wood, 113 Mass. 133.'' This rule has been followed and enforced in many subsequent cases, of which the leading ones in our State may be said to be McClure v. Ullman, 102 Mo. App. 697, 77 S. W. 325; Corder v. O'Neil, 207 Mo. 632, 106 S. W. 10, and Shohoney v. Quincy, O. &. K. C. R. Co., 231 Mo. 131, 132 S. W. 1059. It is true those cases are over contracts for the sales of land where the agent, without the knowledge and consent of one party to the transaction by whom he was paid and for whom he was acting as agent, was also acting as agent and receiving compensation from the other. But the same principle applies to all contracts tainted with fraud. Thus in the case of the City of Findlay v. Pertz, 66 Fed. 427, it was applied to a case of a sales agent of automatic separators. That agent, while in the employ of the city, ordered from the owners a number of separators, upon the sale of each of which the sellers allowed him a commission, the agreement for such commission being unknown to the board of trustees of the city. The Circuit Court of Appeals of the sixth circuit held that the conduct of the agent in acting as such for both parties without the knowledge of the board and of the sellers in procuring the contract through such agency, was fraudulent as against the city and entitled it to rescind the contract.

In Toledo, Wabash & Western Ry. Co. v. Brooks, Admx., 81 Ill. 245, it was applied to a case of a party, who, while being transported on a train of the railroad company, had been killed. It appearing that the passenger had induced the conductor to violate a rule of

the company in carrying him without the payment of any fare, the Supreme Court of Illinois held, that appearing, the passenger and the conductor were engaged in a deliberate fraud on the company and the administratrix of the deceased could not recover. To the same effect is the decision of the Supreme Court of Minnesota in McVeety v. St. Paul, Minneapolis & Manitoba Ry. Co., 45 Minn. 268.

In Panama & South Pacific Telegraph Co. v. India Rubber, G. P. & T. Works Co., 32 L. T. (N. S.) 517, determined in the English Court of Appeals in Chancery, it appearing that an agent had made a secret arrangement for a commission or compensation with the party with whom he was dealing on behalf of his principal, it was held that there could be no recovery on the contract; that a contract entered into under such circumstances could be set aside and the money paid thereunder recovered. Lord Justice JAMES there said (l. c. 518): ''I take it, according to my view of the law of this court, to be clear that any surreptitious dealing between one principal and the agent of the other principal, is a fraud on such other principal cognizable in this court.''

The learned trial court erred in not instructing the jury that plaintiff could not recover. We have not overlooked the fact that this defense of illegality was not pleaded by defendants. Our Supreme Court has held in several cases, notably in McDearmott v. Sedgwick, 140 Mo. 172, 39 S. W. 776, that the defense of illegality of the contract sued on must be specifically pleaded in the absence of anything in the petition disclosing such illegality. That is but the recognition and application of a very old principle. That rule, however, has no application here as this action was commenced before a justice of the peace and no formal pleading upon the part of the defendant is required, the latter being at liberty to interpose any defense that it may have to defeat the action, even if interposing it

for the first time in the circuit court on appeal, save that where defendant wishes to avail himself of the counterclaim he must have interposed it in the justice's court.

. Our conclusion upon the case is that as it was developed on the trial of this case, on the evidence of plaintiffs themselves, that this corrupt bargain had been made for the payment of this secret commission by plaintiffs to the party acting as agent of the others, and whether for one or the other, or both of the defendants, is immaterial, plaintiffs cannot recover.

In this view of the case it is not necessary to consider any of the other points made.

The judgment of the circuit court is reversed. *Nortoni* and *Allen, JJ.,* concur.

