**WESTERN NEWSPAPER UNION, a corporation, Plaintiff,**

v.

**Ned K. WOODWARD, Defendant.**

**No. 9617.**

United States District Court
W. D. Missouri, W. D.

Aug. 8, 1955.

18

Byron Spencer, and Joseph J. Kelly, Jr., of Spencer, Fane, Britt & Browne, Kansas City, Mo., Frederick W. P. Lorenzen of Dwight, Royall, Harris, Koegel & Caskey, New York City, for plaintiff.

Paul R. Stinson, Lawrence R. Brown and M. J. Bogutski, of Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for defendant.

WHITTAKER, District Judge.

This action for rescission is now before me upon defendant's motion for a summary judgment in his favor. His contention is that the averments of the complaint, and of a portion of paragraph 4 of his answer (stipulated by the parties to be taken as true for the purposes of this motion and its decision), and the recitals of the affidavits and exhibits on file, show that all claims of the plaintiff against the defendant were liquidated, satisfied and discharged as the legal effect of a general release given by plaintiff to one W. W. Brown, in New York, on August 16, 1954, and that, therefore, defendant is entitled to judgment as a matter of law.

Reduced to essence, the complaint alleges that plaintiff, hereinafter called Western, a Delaware corporation, maintaining its principal office in New York City, owned 1,000 of the 1,500 issued and outstanding shares of capital stock of Midwestern Paper Company, a Missouri

corporation, hereinafter called Midwestern, of which the defendant, a citizen of Missouri, was President, and owned 225 shares of its capital stock; that prior to, and on, March 29, 1951, W. W. Brown was one of plaintiff's directors and its Vice President and General Manager, stationed in its New York City office, and that E. L. Walters was its Vice President and Purchasing Agent, stationed in its Omaha, Nebraska office, and that both occupied "fiduciary positions" with, and were "influential and trusted employees of", the plaintiff; that defendant, knowing all this, did, prior to March 29, 1951, secretly offer a reward of 100 shares of the capital stock of Midwestern to each of Brown and Walters for the wrongful purpose of inducing them, and did thereby induce them, "to breach their fiduciary relationship to plaintiff" and "to assist and aid defendant in obtaining from plaintiff 1,000 shares of Midwestern Paper Company stock * * * owned by plaintiff", without "disclosure of their own interest", and, by this means and "fraudulent conduct", defendant, on or about April 4, 1951, fraudulently induced plaintiff "to sell to defendant said 1,000 shares of capital stock of Midwestern Paper Company at $125 per share at a time when the value of said stock was in excess of $300 per share"; that defendant, upon obtaining the certificates for the shares, caused plaintiff's name, as owner of the shares, to be stricken from the stock books and records of Midwestern, at its "offices in Kansas City, Missouri", and caused himself or his nominees or transferees to be recorded on said record as the owner or owners of said shares, thus depriving plaintiff of all its rights as the holder of 1,000 shares of the capital stock of Midwestern.

That plaintiff did not learn of the fraud until June of 1954, when it discovered that about April 12, 1951, defendant, in accordance with his earlier promise to Brown and Walters, transferred to Brown 100 shares of the capital stock of Midwestern for the purported consideration of Brown's promissory note in the amount of $12,500 (no part of which had been paid to the time of the discovery of the fraud in June, 1954, though, meanwhile, Brown had received approximately $18,000 in dividends on said 100 shares), and transferred to Walters 100 shares of the capital stock of Midwestern "for an actual consideration, if any, unknown to plaintiff", and that Walters had, to the time of the discovery of the fraud in June, 1954, received approximately $18,000 in dividends on said 100 shares.

That on August 16, 1954 "plaintiff demanded and received from W. W. Brown the 100 shares of capital stock of Midwestern Paper Company which had been transferred to him by the defendant as aforesaid", and, subsequently, (on September 2, 1954)[1] plaintiff notified defendant that, because of the fraud, "it rescinded said sale * * * and demanded defendant return to plaintiff 900 shares of the capital stock of said company, together with all dividends received thereon from April 4, 1951, to date, an amount unknown to plaintiff, but at least the sum of $162,000, less the purchase price of $112,500", but defendant failed to comply with the demand; that defendant is still the record holder of 900 shares of the capital stock of Midwestern; that plaintiff has no adequate remedy at law and that defendant should not, in good conscience, be permitted to profit by his perversion of plaintiff's fiduciaries, but should be compelled to return to plaintiff 900 shares of the capital stock of Midwestern and all dividends received thereon since the date of the fraudulent sale, less $112,500, the amount paid to plaintiff by defendant for the stock, and the complaint concludes with a prayer accordingly.

It is stipulated by counsel that paragraphs numbered 1, 2, 3, 6 and 7, of the complaint are true, and that all other parts of the complaint shall be assumed to be true for the purposes of this motion

---

1. Page 8 of Perry's affidavit.

and its decision, and that, for the purposes of this motion and its decision, the following allegations of paragraph 4 of defendant's answer shall be assumed to be true, to-wit:

"That in August, 1954, a dispute arose between plaintiff and the said Brown \* \* \*, that said dispute was settled by an exchange of releases between Brown and the plaintiff, and the transfer to plaintiff by Brown of said 100 shares of stock which had been transferred to Brown; that on receipt of said certificate the plaintiff sent the same to Midwestern Paper Company and a new certificate was issued and sent to plaintiff, accepted by plaintiff, and since that time the plaintiff has received dividends thereon; \* \* \* that in addition, the plaintiff and Brown exchanged documents in the city, and county and state of New York, copies of which are hereto attached, marked Exhibits A, B and C, and made a part of this answer. \* \* \* "

Exhibit A is an agreement between Brown and plaintiff, made and delivered in New York, and, omitting signatures, reads as follows:

"Memorandum of agreement between William W. Brown (hereinafter called "Brown") and Western Newspaper Union (hereinafter called "Western").

"Whereas, divers disputes have arisen between the parties hereto and they have determined to settle all accountings and disagreements between them as hereinafter provided,

"Now, therefore, in consideration of the premises and of the provisions hereinafter contained, the parties hereto do hereby agree as follows:

"1. Brown shall deliver to Western 100 shares of the capital stock of Midwestern Paper Company (which Brown represents and warrants is all the stock he or any member of his family owns or ever owned), duly endorsed in blank or accompanied by duly executed stock power for transfer of the same with the name of Western. This delivery shall be made without any cost or expense in any way to Western at the office of Dwight, Royall, Harris, Koegel & Caskey, on or before August 27, 1954.

"2. Western agrees to accept said 100 shares of capital stock of Midwestern Paper Company in full satisfaction of all its claims against Brown to the date hereof.

"3. Brown acknowledges that any claim or claims he has against Western have been offset by Western's claims against him.

"4. The parties hereto agree to enter into mutual general releases, one from the other.

"In witness whereof, this memorandum has been duly signed and sealed this 16th day of August, 1954."

Exhibits B and C are general releases of all claims made, executed and delivered by plaintiff to Brown, and by Brown to plaintiff, respectively, in New York City, on August 16, 1954. The only express reservation in the releases was "that nothing contained herein shall release said party from its obligations under an agreement between said parties of even date herewith".

There are two affidavits before me, one by W. W. Brown (filed by defendant), and one by Farwell W. Perry (filed by plaintiff).

Brown's affidavit recites that he became a director of plaintiff in 1938, and that he became its Vice President, Treasurer and General Manager in 1945; that defendant, for many years, had been offering to purchase plaintiff's stock in Midwestern, and that in 1951 he renewed his offer, to Brown, saying he would sell his stock for $150 a share or purchase plaintiff's stock for $125 per share, and that if plaintiff did not sell to him at that price he proposed to leave Midwestern and set up a new competitive business.

Brown communicated this offer to plaintiff's president, Perry, who called a meeting of the directors of the plaintiff in New York City. At this meeting, Brown's affidavit says, "I repeated to the directors what I had said to Mr. Perry, and the directors decided to accept Woodward's offer. All of the directors, including myself, voted in the affirmative." He attaches a copy of the directors' resolution. It is dated March 29, 1951, and, omitting recitals of plaintiff's ownership of the stock, and a description of the several certificates evidencing the same, reads as follows:

"And whereas, N. K. Woodward, of 6810 Penn Street, in Kansas City, Missouri, has offered to purchase all of said 1,000 shares for the sum of $125,000,

"Now, therefore, be it resolved that this corporation accept the offer of said N. K. Woodward, and sell to him said 1,000 shares of capital stock of Midwestern Paper Company for the sum of $125,000, and that W. W. Brown, as Executive Vice President of this corporation, be, and he hereby is, authorized and directed to deliver or cause the delivery of said shares to Mr. Woodward, pursuant to his instruction, against receipt of payment for the account of this corporation of the sum of $125,000."

Thereupon, Brown, in New York, telephoned Woodward, in Kansas City, and told him of the directors' acceptance of his offer. The stock certificates, endorsed in form for transfer, were then sent to the First National Bank in Kansas City, with instructions to deliver them to Woodward against receipt of $125,000 to be remitted to plaintiff. The certificates were delivered and the money paid at the bank in Kansas City; that all representations made by Brown to plaintiff's president and its Board of Directors were made in New York City. He continues, "I afterwards acquired from Woodward 100 shares of Midwestern Paper Company's stock" and "shortly after the closing of this transaction, Walters received from Woodward 100 shares of the capital stock of Midwestern Paper Company"; that when affiant returned from a trip to Houston, Texas, on June 9, 1954, plaintiff's president, Perry, accused Brown "of stealing between $150,000 and $250,000 of Western Newspaper Union's money", and requested him to sign, and he did sign, a resignation. His affidavit recites further that he learned that while he was away a file in his office was opened "and it was discovered that I had acquired the 100 shares of the stock of Midwestern Paper Company", and Perry advised him that his "accounts were being audited and that certain shortages had been discovered". After the audits were completed, Brown and his lawyer met with plaintiff's president and its lawyer in New York City on August 16, 1951, where, Brown says, "the various charges against me were discussed." Brown countered with claims against plaintiff for (1) breach of his contract of employment for the year ending June 30, 1954, (2) a bonus for the year ending June 30, 1954, (3) severance pay of one year's salary, and (4) a possible action for slander against Perry, and, the affidavit says, "the result was that I agreed to endorse and deliver to the Western Newspaper Union my 100 shares of stock, free and clear, and that we would exchange general releases, which we did", and that the releases were executed and delivered in New York City on August 16, 1951, and that Brown afterwards mailed the certificate for 100 shares of Midwestern stock from Cleveland, Ohio, to plaintiff's attorney in New York.

Perry's affidavit recites that it came to his attention in June, 1954, that Brown, since 1946, while serving as a director and officer of plaintiff, had appropriated "substantial sums" belonging to plaintiff, and a complete investigation was ordered and conducted by a firm of accountants and a detective agency, which disclosed defalcations by Brown, and as a result Brown was afforded an opportunity to resign, and did so on June 9, 1954. Subsequently, plaintiff made claim against Brown for (1) commissions "secretly re-

ceived" by Brown from one Schwartz, from 1946 until June of 1952, (2) return of monies obtained through "padded" expense accounts from January 1, 1946 to June 1, 1954 (the total dollar amount of the secret commissions and padded expense accounts "was unknown and uncertain"), and (3) "It appeared that Brown had participated in the sale of the Midwestern Paper Company stock to Woodward as alleged in the complaint herein". Against these claims Brown countered with claims against plaintiff for (1) a bonus, in the amount of $30,000, for the year ending June 30, 1954, (2) severance pay of a year's salary, and (3) compensation for "improper discharge". On August 16, 1954, a conference was held between plaintiff's president and its attorney, and Brown and his attorney, in New York City, at which plaintiff agreed "to settle on the basis of accepting from Mr. Brown the 100 shares of stock of Midwestern Paper Company that he had acquired from Mr. Woodward without paying any consideration therefor", and to "to settle all claims Newspaper Union had against him (Brown) arising out of his various breaches of fiduciary duty owed to Newspaper Union and * * * all the claims which Brown had against Newspaper Union", and "it was made clear to Brown and his attorney in the course of the * * conference that Newspaper Union intended forthwith to proceed against Woodward to get back the Midwestern Paper Company stock and, likewise, to proceed against Walters for his breach of duty to Newspaper Union", and, agreement accordingly being reached, Exhibits A, B and C were prepared, signed and delivered in New York City. Affiant affirms (very probably in violation of the parol evidence rule) that he "did not intend the settlement to involve Newspaper Union's right to recover from Woodward the Midwestern Paper Company stock which he had obtained as alleged in the complaint", and that "the release given to Brown in August of 1954 was not intended by Newspaper Union, and could not have been intended by any other party to that settlement, to release any claim against Woodward. There was never any suggestion by anyone that such would be its effect."

The affidavit continues, saying that Brown, as Executive Vice President and director of plaintiff, "was the party on behalf of" plaintiff "who had contact with Woodward in 1951", and that Brown represented that if the sale was not made to Woodward on his terms he would leave Midwestern's employ and take with him most of Midwestern's business; that Woodward's offer of $125 per share "was so much less than the estimated value" that affiant "did not want to accept Woodward's offer even with Brown's representation", and, before recommending acceptance to plaintiff's Board of Directors, he "checked with Vice President * * * Walters * * * (by telephone) and he made representations similar to those made by Brown", and on the basis of the representations made by both Brown and Walters, affiant recommended, and so did Brown, to plaintiff's Board of Directors, at their meeting of March 29, 1951, acceptance of Woodward's offer of $125 per share for plaintiff's 1,000 shares of stock in Midwestern, and the directors, on the basis of those recommendations, and in ignorance of the fact that Brown and Walters "had been promised a bribe by Woodward", adopted the above-quoted resolution authorizing the sale.

Affiant states that thereafter, on March 30, 1951, the certificates evidencing the stock were sent to the First National Bank of Kansas City, Missouri, under covering letter of that date (copy of which is attached as an exhibit to the affidavit), instructing the bank to deliver them to Mr. Woodward against his payment of $125,000 for the account of plaintiff, and that the money was paid by defendant to said bank for plaintiff's credit, and the bank delivered the certificates to defendant; that on September 2, 1954, plaintiff made formal demand in writing upon defendant for return of the 1,000 shares of stock, which demand was refused.

These are the facts upon this submission, and the ultimate question for decision is whether the release of Brown also released defendant.

Defendant claims that this submission factually and legally shows that he, Brown and Walters, as co-conspirators or joint tortfeasors, committed a fraud or tort upon plaintiff in the state of New York, which is governed by its laws, and that plaintiff was entitled to but one satisfaction, and when plaintiff executed and delivered a general release to joint tortfeasor Brown, in the state of New York, on August 16, 1954, without expressly reserving its claim against defendant, it acknowledged full satisfaction of its claims in respect of the transaction, and, under the New York law, which governs the release—because made there—, the effect was to release and discharge all claims against defendant, and that, therefore, he is entitled to summary judgment as a matter of law. On the other hand, plaintiff contends that the fraudulent wrong, though jointly perpetrated by defendant, Brown and Walters, was finally committed upon it in Missouri, where legal situs of the stock existed, and where it parted with physical possession of the stock certificates, and that, therefore, its remedy or election of remedies in respect of the transaction, are governed by the laws of Missouri, and that the release, though made in New York, is governed by the laws of the state that govern the claims thereby released (in this case Missouri), and that Missouri does not recognize the "joint tortfeasor release bar rule" as applied in New York, and for this reason the release in no way bars this action; and, moreover, even if the tort and the release are held to be governed by the laws of New York, the release is not a bar to this action in equity to rescind, because the New York joint tortfeasor release bar rule applies only to *actions at law for unliquidated damages.*

■ Under the law of Missouri, the release of one of several joint tortfeasors does not discharge other joint tortfeasors unless the release acknowledges "full satisfaction"[2], and, because of that fact, defendant concedes that if, as plaintiff contends, the release is governed by the laws of Missouri, and not of New York, its motion for a summary judgment would be properly denied.

■ The first question then is: What law governs, first, the tort, and, second the contract of release? Inasmuch as the claimed bar of this action rests entirely upon the release, it would not be necessary presently to determine what law governs the tort were it not for the fact that the cases hold that a contract of release, absent, as here, express designation of other laws to control it, is presumed to have been made in contemplation of, and, hence, to be governed by, the laws of the state that created or gave rise to the right thereby released[3]," but because of that fact it is necessary to determine what law governs the tort, and so doing will also determine the law that governs the contract of release.

■■ It is the general law, and the law of conflicts in Missouri, and the parties agree, that in tort actions governed by state law, the law of the state in which the injury or loss was suffered, and which, hence, created the right, governs the tort, and that, in cases of fraudulent misrepresentation, it is not the law of the state where the misrepresentations were made, but, rather, the law of the state where the misrepresentations were intended to, and did, operate to cause the

2. Section 537.060 RSMo 1949, V.A.M.S.; Berry v. Kansas City Public Service Co., 343 Mo. 474, 121 S.W.2d 825; Farrell v. Kingshighway Bridge Co., Mo.App., 117 S.W.2d 693; Roberts v. Atlas Life Ins. Co., 236 Mo.App. 1162, 163 S.W.2d 369; Kahn v. Brunswick-Balke-Collender Co., Mo.App., 156 S.W.2d 40, and the numerous cases therein cited.

3. Preine v. Freeman, D.C., 112 F.Supp. 257; Smith v. Atchison, T. S. F. Ry. Co., 8 Cir., 194 F. 79; Lindsay v. Chicago, B. & Q. R. Co., 7 Cir., 226 F. 23; Goldstein v. Gilbert, 125 W.Va. 250, 23 S.E.2d 606.

injury or loss that control the tort[4], but the parties do not agree upon the state in which the claimed fraudulent conspiracy was intended to, and did, finally operate to cause plaintiff to suffer injury and loss.

■ It seems plain, as pointed out by defendant, that the claim is that defendant conspired with and bribed trusted officers of plaintiff, Brown and Walters, to breach their fiduciary duties to plaintiff by fraudulently inducing plaintiff's president and Board of Directors, in New York, to accept defendant's offer of $125 per share for stock worth $300 per share, and that whatever misrepresentations were made by Brown to plaintiff's president and its Board of Directors were intended to be, and in fact were, made to them in New York and there operated to fraudulently induce acceptance of defendant's offer to plaintiff's injury, and, likewise, the representations, confirmatory of Brown's earlier representations, made by Walters to plaintiff's president, Perry, in the latter's telephone call from New York to the former at Omaha, Nebraska, are, in law, to be regarded as made in New York,[5] where they, like Brown's representations, were designed to, and did, operate upon plaintiff's president and Board of Directors to fraudulently induce their acceptance of defendant's offer, and that it was that fraudulent conduct, operating upon plaintiff's president and Board of Directors in New York that there induced acceptance of defendant's fraudulent offer—and that is what caused plaintiff's injury, and it occurred at that time and place.

Plaintiff, in support of its contention to the contrary, points out that Midwestern is a Missouri corporation and that the certificates for the stock, though physically in New York at the time of the fraudulently induced acceptance, are but evidence of the shares, and not the shares themselves, and that legal situs of the shares, (except for certain purposes, such as excise taxation, not material here) is in the state of incorporation of the issuing corporation[6], and that, therefore, the stock (as distinguished from the certificates evidencing the same) was actually in Missouri at the time of the fraudulently induced acceptance of the offer, and that even the certificates evidencing the stock, though endorsed for transfer in New York, remained in its possession, through its agent, the bank in Kansas City, until actually delivered by that agent, in Missouri, to defendant against his payment of the accepted price, and, therefore, plaintiff argues that not only was the property in Missouri, but the last act that resulted in the loss, namely the delivery of the certificates, occurred in Missouri, and hence, its injury and loss was suffered in Missouri and the tort is to be governed by its laws.

I believe that the question here is not determined by the legal situs of the stock, nor by the place of actual delivery of the certificates evidencing the stock, but, rather, depends upon the place where

4. Electric Theatre Co. v. Twentieth Century Fox Film Corp., D.C.W.D.Mo., 113 F.Supp. 937; Restatement of the Conflict of Law, Section 377, p. 457; 2 Beal, The Conflict of Laws (1935), Section 377.2, p. 1287; Iasigi v. Brown, 17 How. 182, 58 U.S. 23, 15 L.Ed. 208; Smyth Sales v. Petroleum Heat & Power Co., 3 Cir., 128 F.2d 697; James-Dickenson Farm Mortgage Co. v. Harry, 273 U.S. 119, 47 S.Ct. 308, 71 L.Ed. 569; Commonwealth Fuel Co. v. McNeil, 103 Conn. 390, 130 A. 794; Bradbury v. Central Vt., 299 Mass. 230, 12 N.E.2d 732; Hughes Provision Co. v. LaMear Poultry & Egg Co., Mo.App., 242 S.W.2d 285.

5. Restatement of Conflict of Laws, Section 326, Comment "C"; Corbin on Contracts, Section 79, p. 252; Cardon v. Hampton, 21 Ala.App. 438, 109 So. 176; Dallas Waste Mills v. Early-Foster Co., Tex.Civ.App., 218 S.W. 515; Bank of Yolo v. Sperry Flour Co., 141 Cal. 314, 74 P. 855, 65 L.R.A. 90, and Cuero Cotton, Oil & Mfg. Co. v. Feeders Supply Co., Tex.Civ.App., 203 S.W. 79.

6. Richardson v. Busch, 198 Mo. 174, 95 S.W. 894; State ex rel. N. American Co. v. Koerner, 357 Mo. 908, 211 S.W.2d 698, and Armour Bros. Banking Co. v. Smith, 113 Mo. 12, 20 S.W. 690.

the fraud was designed to, and did actually, operate to induce the fraudulent contract of sale—which is what injured the plaintiff—, and that happened in New York, and I think it follows, in accord with the cases cited, that the tort was committed, and plaintiff's injury occurred, in the state of New York, and its right or rights of action, and all defenses thereto, were created in, and are governed by, the laws of that state. Because, as heretofore stated, the cases[7] hold that absent, as here, any express provision in the contract to the contrary, it is presumed that parties to a contract of release contracted in contemplation of the law that created and governed the claim thereby released, it follows from the foregoing determination—that the tort was committed under, and is governed by, the laws of New York—, that the validity, interpretation and effect of the contract of release is likewise governed by that law.

▪▪ This brings us to the question of whether plaintiff's release of Brown, in the circumstances here, operated, under the New York law, to release defendant also, as contended by defendant. There appears to be no doubt that it is the law of New York that one injured or damaged by a tort is *entitled to but one satisfaction*, and that, absent express reservation to the contrary, *a release is presumed to have liquidated the amount of the claim at the amount stated in the release*, and that when a general release, without express reservation of rights against others, is given to one of several joint tortfeasors *on a legal claim, or action at law, for an unliquidated sum of money*, the legal effect is to work a full satisfaction of the claim, and, hence, a discharge of all the joint tortfeasors.[8] Nor does there appear to be any doubt, under the New York decisions, that where, as here, several persons conspire, or join a conspiracy, to defraud or injure another, and the conspired result is achieved, the co-conspirators are joint tortfeasors, regardless of degree of participation, and are jointly and severally liable to the injured or damaged person.[9]

▪▪ But, in New York, as generally held elsewhere, when a person has been induced by fraud to contract away his property for an inadequate consideration, he has an election of remedies. One, he may elect to affirm the fraudulent transaction and sue one or more of the joint tortfeasors for his damages[10], and if he makes this election and then settles his legal claim, or action at law, for unliquidated money damages, with one of the joint fraudfeasors, he has thus liquidated his claim at the amount stated in the release and has accepted that amount, which works a full satisfaction and a discharge of all the joint fraudfeasors.[11] Two, instead, he may elect to disaffirm the fraudulent transaction and to make claim, or sue in equity, for rescission—to follow his property into the hands of the fraudfeasors or those who took with knowledge of the fraud, and to get it back—, and if he makes this election his claim, or equitable action for rescission, is not joint but is several, and he is limited in his recovery of property from each of the fraudfeasors to that portion of his property that they severally got, and a release of one of the fraudfeasors, after such election to rescind, and upon, or in consideration of, his return of the portion of the property he fraudulently received, obviously does

---

7. See note 3.

8. Milks v. McIver, 264 N.Y. 267, 190 N.E. 487; Rushford v. United States, D.C. N.Y., 92 F.Supp. 874; Rector, Church Wardens and Vestrymen of St. James Church v. City of New York, 261 App. Div. 614, 26 N.Y.S.2d 762; In re Allen's Estate, 178 Misc. 855, 36 N.Y.S.2d 630, and the numerous cases therein cited.

9. National Drama Corporation v. Burns, Sup., 183 N.Y.S. 739, 741; Lonsdale v. Speyer, 249 App.Div. 133, 291 N.Y.S. 495, 504, 505; Burgess Bros. Co., Inc., v. Stewart, 112 Misc. 347, 184 N.Y.S. 199, 200.

10. Merry Realty Co. v. Shamokin & Hollis Real Estate Co., 230 N.Y. 316, 130 N.E. 306; See generally 17 C.J.S., Contracts, § 167, p. 523.

11. Cases cited in Note 8.

not work a full satisfaction of plaintiff's claim nor a release of other joint fraudfeasors, but, rather, they remain liable to, and only to, an action of rescission in equity to compel them, severally, to return the portions of the property they fraudulently, severally, received.[12]

It seems to me that the facts here show that plaintiff, upon discovery of the fraud, elected, not to affirm the sale and to make claim, or to sue, at law for unliquidated damages, but, rather, to rescind the fraudulent sale and to seek return of its property. This seems clear from the following facts: (1) Upon discovery of the fraud plaintiff made claim upon Brown for the return to it of the 100 shares of its capital stock in Midwestern which he had received in, or out of, the fraudulent stock sale, (2) In the "Memorandum of Agreement", of August 16, 1954, it was stipulated and represented that "Brown shall deliver to Western 100 shares of the capital stock of Midwestern Paper Company (which Brown represents and warrants is all the stock he or any member of his family owns or ever owned) * * * " in Midwestern, (3) Plaintiff told Brown, in their discussions of the settlement with him, on August 16, 1954, that it intended to pursue defendant to recover back the portion of its property which he had severally received and retained out of the fraudulent stock sale, and (4) Plaintiff, very soon thereafter, actually did so pursue defendant, by letter of September 2, 1954, and by the means of this suit, for the return to it by defendant of all of its capital stock in Midwestern which he had received in the fraudulent stock sale.

Surely, this amounted to an election to disaffirm the fraudulent sale and to pursue the remedy of rescission. And under that election to rescind and the law,

plaintiff's only claim against Brown, in respect of the fraudulent stock sale, was for the return of the 100 shares he had received in, or out of, the fraudulent stock sale, and when Brown returned, or contracted to return, as he did, that 100 shares to plaintiff, he had discharged his full and only liability to plaintiff, in respect of the fraudulently induced stock sale, and that was the liability acquitted by the release.

Though the "Memorandum of Agreement" of August 16, 1954, said that "Western agrees to accept said 100 shares of capital stock of Midwestern Paper Company in full satisfaction of all its claims against Brown to the date hereof", there were then no other open claims between Brown and plaintiff, for the other claims and cross claims between them (all foreign to the fraudulently induced stock sale) had been agreed to be mutually offset, as the "Memorandum of Agreement" continues, saying, "Brown acknowledges that any claim or claims he has against Western have been offset by Western's claims against him". Plaintiff's claim against Brown for rescission, having been satisfied by his agreement to return the 100 shares he had received, and the foreign claims and cross claims between the parties having been satisfied by being mutually offset, plaintiff and Brown had composed and satisfied all claims existing between them, and the "Memorandum of Agreement" continued, saying, "The parties hereto agree to enter into mutual general releases one from the other", and they did so, later that day; but note that the release from plaintiff to Brown did not spend Brown's covenant, contained in the "Memorandum of Agreement", to return to plaintiff the 100 shares of Midwestern stock he had received, nor his representa-

12. Pollak v. Staunton, Cal.App., 284 P. 226, affirmed, 210 Cal. 656, 293 P. 26; McClure v. Law, 161 N.Y. 78, 55 N.E. 388; Veazie v. Williams, 8 How. 134, 49 U.S. 134, 12 L.Ed. 1018; Flannery v. Flannery Bolt Co., 3 Cir., 108 F.2d 531; Meyer v. John W. Corley Pub. & Promotion Co., 179 Mo.App. 695, 162 S.W. 273; Euneau v. Rieger, 105 Mo. 659, 16 S.W. 854; Holt v. Joseph F. Dickmann Real Est. Co., Mo.App., 140 S.W.2d 59; In re Dant & Dant of Kentucky, D.C.W.D.Ky., 39 F.Supp. 753, affirmed, Kessler v. Jefferson Storage Co., 6 Cir., 125 F.2d 108, and the numerous cases there cited.

tion and warranty therein that such was all of the stock of Midwestern he held, as the release contains an express reservation "that nothing contained herein shall release said party from his obligations under an agreement between said parties of even date herewith". This does not show an election by plaintiff to affirm the fraudulent stock sale, nor a claim, nor satisfaction of any claim, by plaintiff, for unliquidated damages, but, to the contrary, shows an election by plaintiff to disaffirm the fraudulent stock sale and to pursue the remedy of rescission, and shows a satisfaction and release of plaintiff's rescission claim against Brown—which was not joint, but several —for the return of the 100 shares of its stock he had received in or from the fraudulently induced stock sale.

Upon these facts and the law, I conclude that plaintiff, upon discovery of the fraud, elected to rescind the fraudulent stock sale, and that its claims for equitable rescission were not joint (inasmuch as the fraudfeasors did not jointly receive and retain its 1,000 shares of Midwestern stock) but were several (against each, severally, for the amount of its stock they, respectively, received), and that the release given by plaintiff to Brown discharged Brown's several equitable obligation to return the 100 shares of Midwestern stock which he had received in, or as a result of, the fraudulent sale (as he had contracted to return them), and released all the other independent claims which plaintiff had against Brown, but it did not release or discharge defendant or Walters from their several equitable rescission obliga-

tions to return to plaintiff that portion of plaintiff's property which they severally received, and still hold *lis pendens* or otherwise, as a result of, and with the knowledge of, the fraudulent sale.

This conclusion renders unnecessary any discussion, further than encompassed above, of plaintiff's contention that the New York "joint tortfeasor release bar rule" is applicable only to actions at law for unliquidated damages and would not, in any event, apply in bar of this action in equity for rescission, though I may say that does appear to be the law of New York.[13]

Defendant makes the further claim that plaintiff, by accepting conveyance to it from Brown of the 100 shares of Midwestern stock, in, as he argues, settlement of its claim against Brown, knowing that Brown had received the stock from defendant, thus recognized defendant's title to the stock and his right to transfer it to Brown, and, hence, ratified the fraudulent sale to defendant. But what I have said above shows that defendant's premise is baseless—that plaintiff did not take the 100 shares of stock from Brown in payment of damages, but in rescission, so far as in Brown's possession and power, of the fraudulent stock sale, and it follows, in my opinion, that ratification of the fraudulent stock sale is not shown.

It follows from all the foregoing that defendant's motion for a summary judgment in its favor is not well taken and must be denied.

It is, therefore, ordered and adjudged by the court that defendant's motion for a summary judgment be, and it is hereby, denied.

---

13. Milks v. McIver, 264 N.Y. 267, 190 N.E. 487; Sec. 233 and 235 of the New York Debtor and Creditor Law; Gaylor v. Burroughs, 248 App.Div. 915, 290 N.Y.S. 679, affirmed, 273 N.Y. 606, 7 N.E. 2d 716.